BENNETT'S CASE. See Cases Nos. 1,312–1,315.

## Case No. 1,316.

### BENNETT v. ADAMS.

[2 Cranch, C. C. 551.][1]

Circuit Court, District of Columbia. April Term, 1825.

EVIDENCE—FORMER TRIAL—DECEASED WITNESS—PROOF BY GENERAL REPUTATION.

Verdict for plaintiff, $63.68.

BENNETT, (ALLEN v.) See Case No. 214.
BENNETT, (ANGELL v.) See Case No. 387.

## Case No. 1,317.

### BENNETT v. BENNETT.

[3 Cranch, C. C. 647.][1]

Circuit Court, District of Columbia. Nov. Term, 1829.

TRIAL—CONTINUANCE—DEMAND OF SECURITY FOR COSTS.

[See Hawkins v. Willbank, Case No. 6,247.]

[1] [Reported by Hon. William Cranch, Chief Judge.]

## Case No. 1,318.

### BENNETT v. BENNETT.

[1 Deady, 299.][1]

District Court, D. Oregon. Oct. 26, 1867.

DIVORCE — CUSTODY OF CHILDREN — AWARD BY FEDERAL COURT — DIVERSE CITIZENSHIP OF DIVORCED PARENTS — PRESUMPTION AS TO DECREE —STATE STATUTES—JUDICIAL KNOWLEDGE—AUTHENTICATION OF RECORD — REVENUE—HABEAS CORPUS—"CONTROVERSY"—JUDGE AT CHAMBERS.

1. In a suit for divorce, the statute of California (Hitt. Laws, § 2419) gives the court power to make such order for "the maintenance and education of the children of the marriage, as may be just:" Held, that as a proper means of exercising this power, the court may award the custody of such children to either parent; and that although such award may appear unauthorized by such statute as construed in another forum, it cannot be questioned in such forum collaterally.

2. The domicil of the wife follows that of the husband during the existence of the marriage relation, but a divorce leaves the wife at liberty to choose her own domicil, and therefore where parties living in California were divorced, and the man removed to Oregon and acquired a domicil here while the woman remained in California, they became citizens of different states, and the latter may maintain an action against the former in the national courts in Oregon, on account of such difference of citizenship.

3. A decree of divorce, given in a court of California, which provides that it may be modified upon the application of either party—sufficient cause being shown therefor—is not a temporary decree; and the presumption is that it remains unchanged, which presumption can only be overcome by record evidence to the contrary.

4. The national and state courts not being foreign to one another, as the state courts are, but subordinate parts of a complete system of government, with limited and separate jurisdictions, and the former having judicial knowledge of the laws of the several states, and, therefore of the mode of authenticating the judicial records thereof: Semble, that the act of May 26, 1790, (1 Stat. 122,) prescribing the mode of proving the judicial records of a state when used in another state, does not apply to a case where such record is sought to be used in a national court.

[Cited in New England Mortgage Security Co. v. Vader, 28 Fed. 268.]

|See U. S. v. Biebusch, 1 Fed. 213.]

5. The certificate of a judge to the form of attestation of a clerk to a copy of the record of a state court, did not show whether he was the sole judge, chief justice or presiding magistrate thereof, but it appeared from the laws of such state relating to the organization of such court, that it consisted of a single judge: Held, that the authentication was sufficient under the act of May 26, 1789, (1 Stat. 122.)

6. The act of July 13, 1866, (14 Stat. 143,) provides that a party having an interest in an instrument issued without being stamped, may have a stamp affixed thereto, by applying to "the collector of internal revenue of the proper district." Quaere, is the proper district, the one

[1] [Reported by Hon. Matthew P. Deady, District Judge, and here reprinted by permission.]

where the instrument was issued, or where it is owned or sought to be used?

7. Where one person claims the legal right to have the custody of an infant child, and that right is denied and the custody of such child withheld by another, this constitutes a controversy within the purview of the constitution of the United States, (article 3, § 2,) and if the parties thereto be citizens of different states, it is a controversy within the judicial power of the United States to hear and determine by the proceeding known as the writ of habeas corpus.

8. Section 14 of the judiciary act (1 Stat. 81) which authorizes the courts of the United States to issue writs of habeas corpus, is not restrained in its operation by the proviso thereto, except in the case of prisoners in jail under or by color of the authority of a state of the United States, in which case the writ can only issue to bring the prisoner into court to testify.

9. According "to the usages and principles of law," mentioned in section 14 of the judiciary act, the power thereby given to the district court to issue writs of habeas corpus, may be exercised by the judge thereof at chambers.

At law. On October 14, 1867, Susan Bennett exhibited her petition to the judge of the district court, praying for the allowance of a writ of habeas corpus, directed to Sanford J. Bennett, to obtain the custody of her infant child, Anna Bennett, alleged to be unlawfully detained from the petitioner by said Sanford J. Bennett. On the same day the writ was allowed and issued On October 22, the respondent and petitioner appeared before the judge, and the respondent then moved that the writ be dismissed for want of jurisdiction. After argument, by consent of parties, the decision of the motion was reserved until the final hearing. On October 24, the respondent made a return to the writ. To portions of the return the petitioner demurred, and after argument the demurrer was overruled. The petitioner then replied to the return, and the cause was tried and heard upon the questions of fact and law arising upon the evidence and pleadings, which are stated in the opinion of the judge. [Petition granted.]

Lansing Stout, for petitioner.

J. H. Mitchel and William R. Willis, for respondent.

DEADY, District Judge. From the proofs submitted by the parties, and the admissions in the pleadings, I have found certain conclusions of fact which it will be proper to state before considering the questions of law that arise thereon. They are these:

I. That in the month of August, 1862, at Oakland, in the state of California, the respondent and petitioner were lawfully married to one another, and that they continued to live together, in said state, as man and wife, until June 30, 1866, when the petitioner commenced a suit against the respondent in the district court of the seventh judicial district, in and for the county of Sonoma, state of California, to obtain a dissolution of the bonds of matrimony then existing between the petitioner and respondent, and for the care and custody of the said infant child, Anna Bennett, the issue of said marriage.

II. That on July 10, 1866, the respondent, Sanford J. Bennett, was duly served with a summons to appear and answer the complaint of the petitioner in said suit, and that on July 17, 1866, he appeared in said suit and answered the complaint of the petitioner therein; and that afterwards, to wit: on September 26, 1867, and after due proceedings were had in the premises, to all of which the respondent appeared by his attorneys, the said district court of the seventh judicial district, among other things, for and on account of extreme cruelty by the respondent to the petitioner, did adjudge and decree a dissolution of the marriage aforesaid, and that the petitioner being the most proper person therefor, have the care and custody of said infant child, Anna Bennett, the issue of said marriage; which decree and adjudication the said district court of the seventh judicial district, had authority and jurisdiction then and there to pronounce and make, and the same still remains in full force and effect.

III. That the legality of the restraint herein complained of and in the petition herein alleged, has not been previously adjudged.

IV. That on or about July 26, 1866, the respondent removed from the state of California to the state of Oregon, taking with him the said infant child, Anna Bennett, and that he has remained in said state of Oregon ever since, and kept therein, in his custody and control, the said infant child.

V. That said respondent removed said infant child to the state of Oregon, as aforesaid, pending the litigation aforesaid, among other things for the custody of said infant child, for the purpose of placing it beyond the reach of the process of said district court for the seventh judicial district, and thereby preventing the petitioner from having the care and custody of said child, if the same should be decreed to her by said court.

VI. That at the date of the petition and the issuing of the writ of habeas corpus herein, the petitioner, Susan Bennett, was a citizen of the state of California, and the respondent, Sanford J. Bennett, was a citizen of the state of Oregon.

Upon the evidence, I deem these conclusions of fact to be established beyond a doubt, unless it be the one concerning the motive or purpose with which the respondent took the infant child and removed with it beyond the jurisdiction of the court in California, pending the litigation there for the divorce and its custody. The fact of the removal is admitted. The motive with which it was done can only be inferentially known. Considered in connection with the circumstances under which it occurred, the most reasonable inference is, that it was done for the purpose of evading the power and authority of the court, where the parties and child had their regular domicil.

The second and sixth of these conclusions

of fact involve to some extent questions of law. By the second of them it is found that the court in California had authority and jurisdiction to make the decree it did, awarding the custody of the infant child to the mother. In opposition to this conclusion, it was argued by counsel for the respondent, that the law of California did not authorize the court to provide for the custody of the children of the marriage, in a suit for divorce, and that therefore its decree in this respect is void. The act of California declares that, "In any action for a divorce, the court may, * * * at the final hearing, * * * make such order for the * * * maintenance and education of the children of the marriage, as may be just." Hitt. Laws, § 2419.

The argument for the respondent rests upon the proper construction to be given to the words "maintenance and education." Can it ever be necessary and proper in providing for the maintenance and education of the infant children of divorced parents, to provide for their custody? It seems to me that this question can admit of but one answer, and that in the affirmative. As a necessary and proper means to the maintenance and education of an infant child, the party charged with that duty ought to have the custody of it. Take this case for an illustration. If the court had no power to change the custody of the child from the father to the mother, of what avail would be its order that the mother have the maintenance and education thereof. The child is a female, about five years of age, and whoever has the custody of it must or may control and direct its education. The one is implied in the other. The power being given to the court pronouncing a decree of divorce, to make such order upon this subject as to it may appear just—to provide for the maintenance and education of the children of the marriage—it legitimately follows, that as a means to that end, the court may properly control and dispose of the custody of such children.

Again, the court is to make such order in the premises as may be just. The decree of divorce necessarily terminates the conjugal relation of the parties. The family is broken up. The children can no longer remain with both of the parents. One or the other, therefore, must be deprived of the society and services of its offspring. In such a case justice may require, that when the divorce is caused by the fault or misconduct of the father, other things being equal or even unequal, that the custody of the children be given to the innocent party—the mother. But this is not all. The statute of California also declares that the court "may at any time thereafter annul, vary or modify such order, as the interest and welfare of the children may require." Hitt. Laws, § 2419. It cannot be contended that the power to modify is more comprehensive than the power to make the original order. If the inter-

est and welfare of the children are to influence the action of the court in modifying the order for maintenance and education, it is but reasonable to conclude that the legislature intended, that such interest and welfare should be considered and provided for in making the order in the first instance. To do this, especially in the case of infant children, the court must have the power to place them in the proper custody—to give them to that parent most likely, under the circumstances, to promote their interest and welfare. In this case the California court, sitting as a trier of the fact, found that the father was not a proper person to have the custody of this infant child and that the mother was. Under the circumstances, the court was authorized to make such an order for the maintenance and education of this child as to it might appear just, as between the parties, and at the same time calculated to promote its interest and welfare. That the court in the exercise of this power and for these ends, had authority to give the custody of the child to the mother, as a means of providing for its maintenance and education, in a way conducive to its interest and welfare, it seems to me there can be no doubt. This question was argued by counsel for the respondent, upon the assumption that the judgment of the California court was open to review here, and that if it appeared that such court had misconstrued the statute from which it derived its authority, its action should be disregarded as null and void. But I am satisfied the law is otherwise. The court had jurisdiction of the parties and the cause. The cause was the controversy between the parents concerning the divorce and the future maintenance and education of the children of the marriage. Admitting for the purpose of the argument, that the court erred, either as to the fact or the law, in giving the custody of the child to the mother, as a means of providing for its maintenance and education, yet that error can only be corrected by appeal to the proper court of review in California. But collaterally, the legality of this judgment cannot be questioned here or elsewhere. It is conclusive upon the parties to it, throughout the United States, until reversed or modified by the proper court in the jurisdiction where it was given. 2 Am. Lead. Cas. 721.

The sixth conclusion finds that at the date of the commencement of this proceeding, the respondent and petitioner were citizens of different states—the former of Oregon and the latter of California. There is no dispute as to the citizenship of the respondent, but as a matter of law, it is denied that the petitioner is a citizen of California. This denial rests upon the general rule of law that the domicil of the wife is controlled by that of the husband—that in law she is incapable of acquiring a domicil different from that of her husband. It is admitted that this is the general rule, but when the rea-

son of the law ceases the law ceases with it. The domicil of a woman divorced from her husband is no longer that of the latter, but in the place of her own choosing. And this even appears to be the rule before a decree for ·divorce, where the wife is litigating ·for a judicial separation from the husband, on account of misconduct on his part, which entitles her to have the marriage dissolved. Bish. Mar. & Div. § 728; Barber v. Barber, 21 How. [62 U. S.] 582. In the case of Barber v. Barber, supra, the parties while domiciled in the state of New York were divorced simply from bed and board. The divorce was granted at the suit of the wife and the court also decreed her alimony. To prevent the enforcement of this decree as to alimony, the husband left the state and acquired a domicil in the state of Wisconsin. · The wife retained her residence in New York, and sued the husband in the United States court for Wisconsin, to enforce the decree of alimony and prevailed there. The husband appealed the cause to the supreme court. Among other things, it was objected on the behalf of the husband that the national court in Wisconsin ·had no jurisdiction, because the parties to the suit were not citizens of different states. The supreme court held, that even where a divorce was only from bed and board, that the control of the husband over the location of the wife ceased, and that her domicil thereafter must be deemed to be of her own choosing, and that therefore the court had jurisdiction on account of the different citizenship of the parties, and affirmed the decision of the court below. In this case the parties were divorced absolutely and upon the authority of Barber v. Barber, as well as upon principle, thereafter, the domicil of the wife was according to the fact of her residence and not that of her husband. The return of the respondent denied the existence of the ·alleged judgment in the court of California, and on the hearing of cause, the petitioner to support the issue on her part, offered in evidence, what purported to be a transcript of the judgment roll of that court. The respondent's counsel objected to the reading of the transcript, and it was admitted in evidence subject to the objections. After careful consideration of the arguments and authorities, I have concluded that the objections to the admission of the transcript are not well taken.

The objections may be briefly stated as follows: I. The decree for the custody of the child, as set forth in the alleged transcript, is only temporary and not final. II. The certificate of the judge to the attestation of the clerk is insufficient. III. The certificate of the judge is not legally stamped.

The first objection is easily disposed of. The decree provides in terms that it may be modified or changed hereafter, upon the application of either party, upon sufficient cause shown. But surely this is no reason why the decree should be treated as temporary, or why it is not absolute in the meantime. The decree in this respect only reserves to the court the power to modify it hereafter; and the law gives that power to the court whenever the interest or welfare of the child may require its exercise, independent of the reservation in the decree. Until changed, the decree is binding and absolute. The presumption is, that it remains unchanged, and that presumption can only be overcome by record evidence to the contrary. This decree may also be appealed from within a year, as I read the laws of California, but until an appeal is taken, it must be deemed a final decree. The mere right of appeal does not qualify or impair the force or effect of a final decree in an inferior court. The appeal must be actually taken, and that under such circumstances and with such security as would make it operate as a supersedeas. There is no presumption that an appeal has been taken, but the contrary.

The second objection admits of more controversy. The act of May 26, 1790, (1 Stat. 122,) prescribing the mode of proving the judicial records of a state, when used in another state, provided that in addition to the attestation of the clerk and the seal of the court, there shall be "a certificate of the judge, chief justice or presiding magistrate, as the case may be, that the said attestation is in due form." Counsel for the petitioner maintains that this act does not ·apply to the authentication of a state record in the national courts, but only when used in the courts of another state, and that, therefore, the certificate of the judge is here unnecessary.

On several occasions when this subject has been before the inferior courts of the United States, it seems to have been assumed that this mode of authenticating state records is necessary to make them evidence in the national courts. Craig v. Brown, [Case No. 3,328;] Mewster v. Spalding, [Id. 9,513;] Tooker v. Thompson, [Id. 14,097.] But it seems very questionable if this interpretation of the act is the correct one. Of course congress, by virtue of its general power to regulate the mode of proof and procedure in the national courts, may prescribe in what manner and by what means a record of a state or other court shall be proved therein. But was this act passed for such purpose, or was it intended to have any such effect? The act appears to have been passed in pursuance of article 4, § 1, of the constitution. This clause of the constitution has but one object in view—to declare that full faith and credit shall be given in each state to the judicial records, etc., of every other state; and then, as a practical means of making his abstract declaration effectual and useful, to authorize congress to prescribe the manner in which such records should be proved or authenticated, when used in another state, and the effect thereof when proven. Prior

to the adoption of the constitution, under the rule of the common law, the judicial records of each state were treated as foreign judgments in every other state, and therefore only primary evidence of the facts and conclusions therein contained. In addition, each state might, for itself, prescribe in what manner such records should be proved, and might make that proof so difficult or uncertain, as to practically prevent their being used at all. Among a people about "to form a more perfect union," this was felt to be a serious evil, and consequently this provision was inserted in the constitution, and the act of May 26, 1790, [1 Stat. 122,] was passed to carry it into effect. As the state courts do not take judicial knowledge of each other's laws, and could not, therefore, know, without other proof, whether the certificate of the clerk was in due form or not, congress supplied the means of proof, by providing that the judge of the court should certify that the attestation of the clerk was in due form —that is, according to the law of the state where the record was made. But the evil to be prevented by the constitutional provision never existed or could exist, so far as the national courts are concerned. The national and state governments, although vested with distinct jurisdictions, are in no sense foreign to each other, but are subordinate and limited parts of one complete system of government. On principle, then, in the courts of the United States, the judgment of a state court ought to be regarded as a domestic judgment—a judgment given within the territorial sovereignty of the United States, and provable in the ordinary way, by the certificate of the custodian of the original— the clerk of the court. The national courts take judicial knowledge of the laws of every state in the Union. Owings v. Hull, 9 Pet. [34 U. S.] 624; Woodworth v. Spaffords, [Case No. 18,020.] This doctrine can only be maintained upon the theory that the states are a part of the general government and territorially within the jurisdiction of the United States. This being so, the courts of the United States do not require the certificate of the judge of a state court, that the attestation of the clerk thereof is in due form of law. They determine that matter by their knowledge of the laws of the state where it was made. For these reasons, then, it appears to me that in this court, a judicial record of the state of California, is admissible in evidence without the certificate of the judge of the court to the sufficiency or form of the attestation of the clerk.

But as the cases which I have been able to find upon the subject, have been decided upon a contrary assumption, in deference to their authority, I proceed to examine the objection upon the theory, that such certificate is necessary. It is admitted that the certificate of the judge is sufficient, so far as it relates to the attestation of the clerk—that it is in due form of law. The objection is, that

it does not appear from the certificate that the person who made it, is either the sole judge, chief justice or presiding magistrate of the court that made the decree, or even that he is the judge of that court at all. The language of the certificate, so far as it relates to the person who made it, is as follows: "I, J. B. Southard, district judge of the seventh judicial district of the state of California, do hereby certify," etc. The official character of the judge is repeated in the same words after his signature to the certificate.

From the transcript itself, and from the certificate of the clerk, it appears that the decree was made in the district court of the seventh judicial district, in and for the county of Sonoma, state of California. It does not appear, then, from the certificate itself, that J. B. Southard was, at the date of making it, the sole judge, chief justice or presiding magistrate of the district court, in and for the county of Sonoma. Whether the county of Sonoma is within the seventh judicial district, of which J. B. Southard certifies that he is district judge, or whether the district court for Sonoma is held by one or more judges, does not appear from this certificate. Unless, then, the judicial knowledge of the court, as to the laws of California, will supply these deficiencies in the certificate, the transcript cannot be read in evidence under the act of May 26, 1790. The constitution of the state of California (article 6, § 5) requires the legislature to divide the state into a certain number of judicial districts: "In each of which there shall be a district court, and for each of which a district judge shall be elected," etc. Hitt. Laws, § 177. In pursuance of this authority, the legislature of California created the "Seventh Judicial District," including among others therein, the county of Sonoma. Id. § 1337. By section 1358 of the same compilation, it appears: "There shall be held, in the seventh judicial district, terms of said court, as follows: In the county of Sonoma," on certain Mondays therein named. The words "said court," in the paragraph just quoted, refer to the words "district court," previously used in the same act. Take these facts thus proved beyond controversy and add them to the statement in the certificate, "I, J. B. Southard, district judge of the seventh judicial district of the state of California, do hereby certify," etc., and the proof is complete. The district judge of the seventh judicial district, is thus shown to be the judge of the district court in and for the county of Sonoma, and the sole judge thereof, and therefore the person authorized to certify that the attestation of the clerk is in due form.

The case of Owings v. Hull, 9 Pet. [34 U. S.] 624, 625, is a case exactly in point. The circuit court for the district of Maryland, on the trial of an action, admitted in evidence, a copy of a bill of sale executed in Louisiana, without proof to account for the non-production of the original. On error,

the supreme court held, that the court below was bound to take judicial notice of the laws of Louisiana. By those laws it appears that this contract being entered into before a notary, the original properly remained with that officer, and the party only took a copy. In this way the non-production of the original was decided to be sufficiently accounted for, without other proof.

The third objection is yet to be considered. It appears that the certificate of the judge was made and issued without being stamped. It also appears that it was liable to a stamp duty of five cents. On October 21, 1867, before offering to use the certificate, the petitioner procured the collector of internal revenue for this collection district to stamp the same and remit the penalty. This proceeding took place under section 158 of the internal revenue act of June 30, 1864, as amended by the act of July 13, 1866, (14 Stat. 143.) This act authorizes the party issuing the instrument, or any person "having an interest therein, to appear before the collector of the revenue of the proper district," and apply to have the same stamped. The objection is, that the proceeding did not take place before the collector of the proper district, and, therefore, the stamping is without effect.

For the respondent, it is maintained that there can be but one proper district, and that is the one in which the certificate was made and issued. On the other hand, counsel for the petitioner insist that at least where the party making the application is not the one who issued the instrument, the proper district is the one in which the instrument is proposed to be used. It would seem that the word "proper" is used in the act for the purpose of excluding the idea that the proceeding might take place before the collector of "any" district. But which is the proper district is a question easier asked than answered. I am not well satisfied in my own mind how the act ought to be construed in this respect. The objection may be well taken, but it is very technical. The petitioner is an innocent party, having an instrument and desirous of using it in this district. Under these circumstances she has had it stamped here, and I will consider it sufficient.

The only remaining question to be considered is that of jurisdiction. By the constitution, (article 3, § 2,) the judicial power of the United States extends to all controversies between citizens of different states. This is a controversy—a legal controversy—to be tried and determined by judicial proceedings and judgment. The controversy arises upon the alleged legal right of the petitioner to the custody of her infant child, and the denial and withholding of that right by the respondent. This is also a controversy between citizens of different states. The parties, although man and wife, have been divorced by the decree of a competent court in a sister state.

Since then, the citizenship of the wife depends upon the location of her domicil in fact, and does not follow that of the husband. The fiction of law, that the domicil of the wife follows that of the husband, is based upon the legal power of the husband over the person of the wife, as an incident of the marriage relation, and ceases with the reason of it—the existence of the relation itself. It is clear upon principle, and upon the authority of Barber v. Barber, supra, is not open to controversy. But, although the judicial power of the United States extends to and includes a controversy of this kind, it does not necessarily follow that the courts of the United States have jurisdiction and authority to try and determine it. The rule is long since established, that whatever may be the extent of the judicial power of the government of the United States, its courts can only exercise such jurisdiction as may be conferred upon them by congress, excepting only the original jurisdiction of the supreme court, which is given and limited by the constitution itself, and therefore beyond the power of congress to enlarge or diminish. The only authority of this court, or the judge thereof, to exercise jurisdiction or judicial power over this controversy, by means of the proceeding, suit or remedy known as habeas corpus, is derived from section 14 of the act of September 24, 1789, (1 Stat. 81,) commonly called the "Judiciary Act." It enacts: "That all of the before mentioned courts of the United States"—referring to the supreme court and district courts—"shall have power to issue writs of habeas corpus, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law. And either of the justices of the supreme court, as well as the judges of the district courts, shall have power to grant writs of habeas corpus for the purpose of inquiry into the cause of commitment; provided, that writs of habeas corpus shall in no case extend to prisoners in jail, unless where they are in custody, under or by color of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify." This section consists of two distinct affirmative sentences or clauses, and a qualifying proviso. The first sentence confers the power upon the courts generally to issue the writ of habeas corpus agreeable to the principles and usages of law. The second sentence confers the power upon either of the justices of the supreme court and the judges of the district courts, to grant the writ for the purpose of inquiring into the cause of commitment. The proviso limits the power of exercising jurisdiction by means of the writ in the case of prisoners in jail unless they are in custody by authority of the United States. The general scope of the

proviso is also qualified by the last clause of it, which allows prisoners in jail to be brought up on habeas corpus to be used as witnesses, without regard to the authority under which they may be in custody. In Ex parte Bollman, 4 Cranch, [8 U. S.] 75, the supreme court decided, that the proviso extended to and qualified both the previous sentences of the section, and that therefore, in the case of a prisoner in jail—the case specified in the proviso—neither the courts nor the judges of the United States, could grant the writ to inquire into the cause of commitment, except in the instances named in the proviso. This construction of the section has ever since been maintained by the supreme court. Ex parte Dorr, 3 How. [44 U. S.] 105. The object and policy of it are apparent. It was intended to prevent conflicts between the judicial authorities of the national and local governments, and this was accomplished, by limiting the courts of the former, in the exercise of their jurisdiction by means of habeas corpus, in the case of prisoners in jail, to such persons as were in custody by the authority of the United States. As prisoners can only be in jail in the United States by authority, either of a state or the United States, this limitation upon the general power previously conferred in the section, amounts to no more than if the proviso had read thus: "Provided, that the writ of habeas corpus shall in no case extend to prisoners in jail under or by color of the authority of any state of the United States." Public authority—the authority to confine in jail, in this country, only exists in a state and the United States. It follows, then, that the legal effect of the proviso is the same, whether stated as in the statute or as I have just suggested. One expression is the exact equivalent of the other. It is therefore apparent, that the power conferred by the first two sentences of this section, except as to the single instance of prisoners in jail by authority of a state, is not affected, qualified or diminished by the proviso. Its only office is to exclude from the operation of the general power already conferred, the cases of persons in jail by authority of a state, or, stated conversely, not in custody by authority of the United States.

In opposition to this construction of the section, counsel for the respondent maintained that the power to exercise jurisdiction by means of habeas corpus was confined to the cases enumerated in proviso—prisoners in custody by authority of the United States. But this construction rests the general power upon the proviso alone, and simply ignores all the rest of the section. The proviso was not added to the section to confer jurisdiction, but to limit that already granted in the previous part of it. The office of a proviso is to restrain, avoid or impose conditions upon that which precedes it. Without this proviso, upon the letter of the section, the writ might have extended to prisoners in jail under the authority of a state. To prevent this—to avoid the operation of the power conferred by the previous words of the section, in this respect, this proviso is added. What was before absolutely conferred, is now, in the case of prisoners in jail, given conditionally. They must be in custody by the authority of the United States, or the writ shall not extend to them. But this condition in the proviso only extends to the cases of prisoners in jail. In all other cases the general authority conferred by the first two sentences of the section remains unimpaired and unqualified. The case of Ex parte Dorr, 3 How. [44 U. S.] 105, is cited and relied upon by counsel for respondent as supporting his construction of the section. In June, 1844, Dorr was convicted and sentenced to imprisonment for life, by the judgment of the state court of Rhode Island, for the crime of treason against the state. Access to Dorr being denied, the case came before the supreme court, on application on his behalf, for a habeas corpus to bring him before the supreme court, to enable him to sue out a writ of error to the state court. The court refused the application on the ground that Dorr was in prison under the sentence of a state court. The motion does not appear to have been argued, and the court treated it as a matter too plain for argument. But in the course of its brief opinion, in commenting upon section 14, the court says: "The power given to the courts in this section, * * * as regards the writ of habeas corpus is restricted by the proviso to cases where a prisoner 'is in custody under or by color of the authority of the United States.' * * * The words of the proviso are unambiguous. They admit of but one construction. And that they qualify and restrict the preceding provisions of the section is indisputable." The case before the court, and which alone it decided, was the case of a prisoner confined by authority of a state, and the language of the opinion, unless the contrary is manifest, must be confined to the case then under consideration. The question whether the power to issue the writ was restricted to the cases enumerated in the proviso, was not before the court or in the case. Besides the court impliedly qualifies its general statement as to the restrictive effect of the proviso, by limiting it to the case of "a prisoner"—the only case before it. Read with reference to the subject under consideration, this paragraph in the opinion of the court only states, "that in case of a prisoner, the proviso restricts the general power given by the section, to persons in custody under the authority of the United States." But this is not all. In the next clause in the opinion, the court states the rule, conversely, thus:—"Neither this or any other court of the United States, or judge thereof, can issue a habeas corpus to bring up a prisoner, who is in custody under a sentence of execution of a state court, for any other pur-

pose than to be used as a witness." This shows beyond question, the point the court was considering and what it intended to decide. If there is room for a difference of opinion as to what was intended by the first statement of the court, the second one is explicitly against the color now attempted to be given to it. And even, if upon the whole, the language of the court would authorize the conclusion attempted to be drawn from it by counsel, I should hesitate to adopt it. The construction is manifestly erroneous, not to say more—the point was not in the case nor before the court, and I should feel warranted in treating it as an inadvertence of expression readily perceived and easily corrected by an examination of the subject and the context.

The district courts of the United States have power to exercise jurisdiction by means of habeas corpus in all controversies to which the judicial power of the United States extends. As has been shown, that power extends to this controversy, on account of the citizenship of the parties. The power is given by this section; and it is not restricted by the words, "which may be necessary to the exercise of their respective jurisdictions." These words apply only to the last antecedent phrase—"and all other writs not specially provided by statute." In the case of Ex parte Bollman, supra, the supreme court examined this question at length and decided expressly that this grant of power—to issue writs of habeas corpus—could not be taken "in the limited sense of being merely used to enable the court to exercise its jurisdiction in causes which it is enabled to decide finally." Again the court says, in the same case: "From this review of the extent of the power of awarding writs of habeas corpus, if the section be construed in the restricted sense, from a comparison of the nature of the writ which the courts of the United States would, on that view of the subject, be enabled to issue; from a comparison of the power so granted with the other parts of the section, it is apparent that this limited sense of the term cannot be that which was contemplated by the legislature." Of course the reasoning and conclusion of the court in Ex parte Bollman apply to the district courts as well as the supreme court. No distinction between them is made by the court, and none could be made, for as the court says in the same case, "the power is granted to all" (the courts of the United States) "in the same sentence and by the same words." Conkling's commentary on the case is to the same effect, and he adds, "The propriety of the latter construction" — against the limited sense — "was demonstrated by a masterly reductio ad absurdum." Conk. Pr. 77.

It may be said that a power given to a court to issue writs of habeas corpus, cannot be exercised by the judge thereof. Certain writs of habeas corpus only issue from a court, because they are not used except in aid of the jurisdiction of the court in cause before it. But this is the writ ad subjiciendum, and according to the rule prescribed in this section 14—"the usages and principles of law"—may be issued by a judge. Where a court is constituted with more than one judge, it might well be from the nature of its organization, that a grant of power to such a court, to issue writs of habeas corpus ad subjiciendum, could not be exercised by a single judge thereof. Perhaps, for that reason, the second sentence in the section was inserted, giving the justices of the supreme court power to issue the writ in case of commitment. It is true the judges of the district court are included in this provision, but this may have been deemed expedient, out of abundance of caution, to prevent an inference that the power was intended to be denied them. Conk. Pr. 79. This question was not made on the argument. But it has occurred to me during the consideration of the case, and being a question relating to jurisdiction, I do not think it proper to pass it over in silence. After careful deliberation, I have concluded that the power conferred upon the district court to issue the writ ad subjiciendum, may be exercised by the judge thereof. This is "agreeable to the principles and usages of law," regulating the issuing of this writ, as I understand them. If the power conferred upon a judge by the second sentence of this section, to issue the writ to inquire "into the cause of commitment," applies to this case, of course this question would be an immaterial one. But I am not satisfied that the word "commitment," as there used, was intended or can be construed to apply to a case of restraint imposed by a private person. The technical sense of the word—and I am not aware that it has any other signification—is a restraint or confinement by public authority. On the argument of this cause, the case of Barry v. Mercein, [Case No. 1,062,] decided by Judge Betts in the circuit court for the southern district of New York, was relied on by counsel for respondent. The report of the case is not here, but numerous citations from the opinion of the judge, are to be found in the argument of counsel when the same case was before the supreme court on error. 5 How. [46 U. S.] 103. The case was this: Barry, an alien, was married in New York to Mercein, a citizen of New York. Afterwards the parties separated and Barry returned to Liverpool, Nova Scotia. An infant child of the marriage remained in the custody of her mother and her father. Barry applied to the supreme court of the United States for a habeas corpus to obtain the custody of the child. The court refused the writ, because of its want of original jurisdiction. In denying the motion, Story, justice, seemed to assume that the inferior courts of the United States could exercise the jurisdiction. True, this is not asserted in so many words, but certainly nothing is said or sug-

gested to the contrary. The court says: "Without, therefore, entering into the merits of the present application, we are compelled, by our duty, to dismiss the petition, leaving the petitioner to seek redress in such other tribunal of the United States as may be entitled to grant it. If the petitioner has any title to redress in those tribunals, the vacancy in the office of the judge of this court, assigned to that circuit and district" (of New York) "creates no legal obstruction to the pursuit thereof." Ex parte Barry, 2 How. [43 U. S.] 65. In pursuance of this suggestion of the supreme court, Barry applied to the circuit court of the United States for the district of New York. No justice of the supreme court was present, and the application was heard by Judge Betts. He denied the writ on several grounds. the most important of which were want of jurisdiction, and that it appeared that the father was not entitled to the custody of the child. The second ground was a sufficient reason for denying the writ, even if the court had jurisdiction. But, on the question of jurisdiction, the case is not in point. The court was asked to take jurisdiction on account of the difference in citizenship of the parties, and could not take it on any other ground—that the petitioner was an alien and the respondent a citizen of the state of New York. The parties had not been divorced, and the marriage relation was subsisting between them in full force. The rule of law being that the domicil of the wife follows that of the husband, the allegation of the different citizenship of the parties could not be sustained. . But in this case the different citizenship of the parties is a fact established beyond dispute. Since the cause was submitted, I have found a case exactly in point. U. S. v. Green, [Case No. 15,-256.] Aaron Putnam, a citizen of New York, had a habeas corpus directed to Timothy Green to obtain the custody of his infant child. The case was in the circuit court for the district of Rhode Island. The respondent was the maternal grandfather of the child, and it had been left with him by the mother on her death-bed. The case was finally compromised, but Mr. Justice Story issued the writ and compelled a return to it. The question of jurisdiction was not directly raised, but it could not have escaped the attention of court and counsel. The inference is, that the court considered that it was not open to controversy.

Apart from the mere legal question concerning jurisdiction, this is a case, which, upon the merits, this court ought to take cognizance of and give the petitioner the relief prayed for. The respondent found the petitioner in California and married her there. Married her, too, upon a public profession that he had united with the church of her faith—a profession which his answer in the California court substantially admits was a mere pretense to obtain her consent to the marriage. Afterwards, when a controversy arose betwen the parties, involving the custody of the infant child of this marriage, and while that controversy was being litigated in the court of their domicil, respondent, to defraud the petitioner of the probable results of that litigation, left the state and carried the child to Oregon, and compelled the petitioner to follow him here to enforce her rights against him. If it was thought proper and right by the framers of the constitution and congress to give the national courts jurisdiction of a controversy between citizens of different states, where the matter in dispute is mere rights of property—to be measured by mere dollars and cents—why should their jurisdiction not extend to the more important controversy like this, where the matter in dispute is the custody and control of an infant child of the parties. The objection, that the control of the domestic relations belongs properly to the state courts, and that therefore the United States courts ought not to take cognizance of questions concerning them, is merely begging the question. The domestic forum in California has determined who is best fitted and entitled to have the custody of this child. The matter has been adjudged, and this proceeding, rendered necessary by the improper conduct of the respondent, in abducting the child, is only for the purpose of enforcing that adjudication against the respondent. The purpose of this proceeding is not to appoint a guardian, but to enforce a right in the petitioner already established by the judgment of a competent court. If, in the course of the litigation, any question arises, involving the domestic relations, it must be determined for the purpose of this adjudication, as it would be in any other action, suit or proceeding. If A, a citizen of California, sues B, a citizen of Oregon, in the United States circuit court for this district, to recover possession of real property in this state, as he doubtless may, in the progress of the proceeding. it may be necessary to determine questions of marriage, legitimacy, guardianship, or any other question involving what is called the domestic relations of the parties or those under whom they claim. But no lawyer would pretend for a moment, that the court ought not to take jurisdiction of the action on that account.

The premises considered, it · is adjudged that the petitioner is entitled to the custody of the infant child, according to the force and effect of the decree of the court of the seventh judicial district of California for the county of Sonoma, and the marshal is ordered to deliver it to her to keep accordingly.