### KING v. McLEAN ASYLUM OF THE MASSACHUSETTS GENERAL HOSPITAL et al.

#### (Circuit Court of Appeals, First Circuit.    October 12, 1894.)

#### No. 95.

1. CIRCUIT COURTS—JURISDICTION—HABEAS CORPUS—PARENS PATRIAE.
   The circuit courts have no jurisdiction, as parens patriae, to determine, upon habeas corpus, the custody of an insane person, where the question of such custody is one of discretion, as to the place and character of confinement, and not of the legality of any restraint.

2. SAME—DIVERSE CITIZENSHIP.
   A petition for a writ of habeas corpus by a citizen of one state, seeking release from illegal restraint by a citizen of another state, is a suit or controversy between such parties; and the circuit court has jurisdiction, upon the ground of diverse citizenship, to issue the writ and determine such controversy, where the question involved is that of the petitioner's legal right to a discharge from restraint, and not one of discretion as to the place or character thereof.

3. PRACTICE—NEXT FRIEND—GUARDIAN AD LITEM.
   Where proceedings are instituted in behalf of a party by his next friend, the court has undoubted power to supersede such next friend by a guardian ad litem, who may investigate the circumstances of the party and of the proceeding, and, in its discretion, to stay such proceedings, or direct their abandonment.

4. HABEAS CORPUS—INSANE PERSON—POWER OF CIRCUIT COURT.
   K., by his next friend, presented his petition for a writ of habeas corpus, alleging that he was illegally restrained as a lunatic by the M. Asylum: making no specific allegation touching his sanity or insanity, but alleging

defects in the proceedings for his commitment. The return alleged that at the time of his commitment, and at the time of the return, K. was dangerously insane, which the reply neither admitted nor fully denied. A guardian ad litem was appointed by the court, who, after examination, reported, advising against the prosecution of the writ. No testimony was offered by K. or by the next friend to show K.'s sanity. *Held* that, as the circuit court has no power to provide for the care of a person in K.'s alleged condition, it would be prohibited, both by public policy and humanity, from merely discharging him from custody; and, in the absence of proof of K.'s present sanity, the writ should be dismissed, without regard to defects in the original commitment.

**5. SAME—RES ADJUDICATA.**

The dismissal by a state court of a petition for a writ of habeas corpus, though accompanied by a formal order that the petitioner remain in custody, does not constitute res adjudicata in a similar petition in a federal court, where, as in Massachusetts, the dismissal would not be a bar to a new proceeding in the state court.

**6. SAME—PRACTICE—MODE OF REVIEW.**

A proceeding upon habeas corpus is properly removed from the circuit court to the circuit court of appeals by appeal, and not by writ of error.

**7. APPEAL—ASSIGNMENT OF ERRORS.**

The appellate court will only permit those matters to be assigned for error that were brought to the attention of the court below during the progress of the trial. Manufacturing Co. v. Joyce, 54 Fed. 332, followed.

This was a petition by William H. King (by Caleb Eaton, his next friend) for a writ of habeas corpus. The circuit court discharged the writ, and remanded the prisoner to the custody of the McLean Asylum of the Massachusetts General Hospital. Petitioner appealed, pending which he petitioned for a process of contempt, on the ground that he had been removed to an asylum in another district. The contempt proceedings were dismissed (64 Fed. 325), and the cause is now before the court on final hearing.

Edward Avery for appellant.

Geo. O. Shattuck, Wm. A. Munroe, Wm. F. Wharton, and Richard L. Sweezy, for appellees.

Before PUTNAM, Circuit Judge, and NELSON and WEBB, District Judges.

PUTNAM, Circuit Judge. The opinion filed in this case June 4, 1894 (64 Fed. 325), disposed of the question of the jurisdiction of this court, and also of that of the jurisdiction of the circuit court, so far as the latter relates to any alleged restraint contrary to the constitution or laws of the United States, but left open the question of its jurisdiction, so far as based on the diverse citizenship of the parties to the petition. We must dispose of this, because it is necessary to determine whether we should affirm or reverse, or only direct the circuit court to dismiss.

The allegations in the petition touching the citizenship of the petitioner are not in the usual form, and it may well be questioned whether they are sufficient; yet there is so much doubt touching them that the court does not feel itself called on to dismiss the case on this account of its own motion. If the case before the court was one, admittedly, of such degree of insanity in the petitioner

that it was apparent the essential question was of the place and character of his confinement, either for restraint or cure, a very different question would be presented from that which we understand is raised by the record. In that event the circuit court would have been asked to perform the duties ordinarily vesting in a superior court of common law, or in the chancellor, as parens patriae; and under such circumstances it would have had no jurisdiction, as we will explain hereafter. We conclude, however, that the strict issue here is that the petitioner is not of unsound mind, to that extent that he is incapable of self-control or self care, or needs hospital treatment, and that he is entitled to his liberty on the ground that restraint of him as an insane person anywhere cannot be authorized. We have come to this understanding, although the pleadings are not positive on this point. The precise question of jurisdiction thus raised has not been authoritatively determined. In Re Burrus, 136 U. S. 586, 10 Sup. Ct. 850, the following occurs on pages 595 and 596, 136 U. S., and at page 850, 10 Sup. Ct.:

"So far as the question whether the custody of a child can be brought into litigation in a circuit court of the United States, even where the citizenship of the opposing parties is such as ordinarily confers jurisdiction on that court, the matter was left undecided in the case of Barry v. Mercein [5 How. 103]. Obviously, although the statutes of the United States have since enlarged the jurisdiction of the circuit courts by declaring that they shall have original cognizance, concurrent with the courts of the several states, of all civil suits arising under the constitution or laws of the United States, or treaties made, or which shall be made, under their authority, the difficulty is not removed by this provision, for, as we have already said, the custody and guardianship by the parent of his child does not arise under the constitution, laws, or treaties of the United States, and is not dependent on them. But whether the diverse citizenship of parties contesting this right to the custody of the child could, in the courts of the United States, give jurisdiction to those courts to determine that question, has never been decided by this court, that we are aware of. Nor is it necessary to decide it in this case, for the order for the violation of which the petitioner is imprisoned for contempt is not a judgment of the circuit court of the United States, but a judgment of the district court of the same district."

In addition are the expressions cited on page 595, 136 U. S., and page 850, 10 Sup. Ct., from Barry v. Mercein, 5 How. 103, to the effect that the questions involved in writs of habeas corpus are ordinarily incapable of being reduced to any standard of pecuniary value. We are entirely satisfied, however, that none of the statutes relating specifically to the jurisdiction of the circuit courts, and involving money values as a condition of such jurisdiction, including that of March 3, 1875, c. 137 (18 Stat. 470), and that of March 3, 1887, as re-enacted by the act of August 13, 1888, c. 866 (25 Stat. 433), has taken from them jurisdiction of the issue in this case, so far as it can be found, if at all, in any older statute, and that, therefore, we are not required in this case to look for a money value. That such statutes have only a limited range, either in vesting the circuit courts with jurisdiction, or, on the other hand, of divesting them of jurisdiction given them by any authority outside of statutes of that particular class, was settled in Re Hohorst, 150 U. S. 653., 14 Sup. Ct. 221. The proposition is also supported by U. S. v. Mooney, 116 U. S. 104, 6 Sup. Ct. 304. Here it was held that the

general terms of the act of March 3, 1875, did not invest the circuit courts with jurisdiction over suits for penalties and forfeitures, which had been before exclusively vested in the district courts. The court said (page 106, 116 U. S., and page 304, 6 Sup. Ct.):

"To sustain the contention of plaintiffs [that is, the United States], we must hold that the purpose of section 1 of the act of March 3, 1875, was to repeal by implication, and supersede, all the laws conferring jurisdiction on the circuit courts, and, of itself, to cover and regulate the whole subject. But this construction would lead to consequences which it is clear congress did not contemplate. All the laws in force December 1, 1873, prescribing the jurisdiction of the circuit courts, were reproduced in Rev. St. § 629; and the jurisdiction was stated under twenty distinct heads, eighteen of which had reference to the jurisdiction in civil cases. In sixteen of these eighteen heads the jurisdiction is conferred without reference to the amount in controversy. * * * The act of 1875, it is clear, was not intended to interfere with the prior statutes conferring jurisdiction upon the circuit or district courts in special cases, and over particular subjects. Bank v. Harrison, 3 McCrary, 162, 8 Fed. 721. Its purpose was to give to the circuit courts a jurisdiction which the federal courts did not then possess, by enlarging their jurisdiction in suits of a civil nature at common law or in equity, and not to take away from the circuit or district courts' jurisdiction conferred by prior statutes, or to divide the jurisdiction which had for so long a time been vested exclusively in the district courts."

Section 751 of the Revised Statutes, giving power to issue writs of habeas corpus, stands, so far as the statutes of March 3, 1875, August 13, 1888, and other statutes of that class, are concerned, on the same footing as section 629, referred to in U. S. v. Mooney; so that if section 751, and the original enactment out of which it arose, ever vested in the circuit courts jurisdiction when the issues arose as they arise in the case at bar, that jurisdiction remains unaffected by any other legislation. In re Louisville Underwriters, 134 U. S. 488, 10 Sup. Ct. 587, also tends to confirm our conclusions on this point.

It is claimed by the appellees that this proceeding is not a controversy, in the sense of the constitution, and that it is only an inquisition in behalf of the state. The appellees rely even on the method of entitling the cause, but this palpably goes too far. Cases of habeas corpus in the federal courts may, after the writ issues, be entitled in behalf of the United States, as was done in the first one before the supreme court. U. S. v. Hamilton, 3 Dall. 17. So that, if the entitling was of effect, we would have here a proceeding in behalf of the United States, over which its courts would clearly have jurisdiction. However, this matter of entitling with the name of the sovereign or state, and substantially all that was formerly said touching the prerogative character of certain writs, have long ceased to be of value. Com. v. Dennison, 24 How. 66, 97. It is true that, as claimed by the appellees, Judge Betts, in his opinion in Re Barry, 136 U. S. 597, 42 Fed. 113, did say, on page 615, 136 U. S., and page 113, 42 Fed., as follows:

"A procedure by habeas corpus can in no legal sense be regarded as a suit or controversy between parties. It is an inquisition by the government, at the suggestion and instance of an individual, most probably, but still in the name and capacity of the sovereign, to ascertain whether an infant is in this case wrongfully detained, and in a way conducive to its prejudice."

But the latter of his two sentences qualifies the first, and shows that he had in mind the same class of writs which Chief Justice Shaw observed upon, when, in Com. v. Briggs, 16 Pick. 203, he said, on page 205, that "as a general rule the writ of habeas corpus, and all action upon it, are governed by the judicial discretion of the court, in directing which all the circumstances are to be taken into consideration." The writ before Judge Betts, as well as that which Chief Justice Shaw was considering, involved only the question of the custody of a child, with reference to which the court sits parens patriae, and the remarks of these learned judges were appropriate to that subject-matter. We may as well emphasize at this point the distinction between proceedings under the writ, when they truly involve personal liberty, and proceedings like those before Judge Betts and Chief Justice Shaw, touching the custody of a child,—a distinction which we have already made the basis of our consideration of the issues in this case. The former involve matters of right, but the latter only the exercise of a wise discretion as to care, nurture, or education, and the writ is merely a convenient incident of the litigation. The distinction was well made by Judge Betts, in 136 U. S., on page 602, and in 42 Fed., page 113, as follows:

"The incongruity of awarding proofs, at the instance of husband or wife, to take away an infant child from the parent having it in nurture and keeping, upon the allegation that such keeping is a wrongful imprisonment, is most palpable and striking. It is a bold figure of speech, or rather fiction, to which the law ought not to resort, unless indispensably necessary to be employed in preservation of parental rights, or the personal fondness of the child."

To follow these suggestions to their legitimate conclusion, the inference from them is that where the court proceeds parens patriae this writ continues its prerogative character; but where the issue is that of actually illegal restraint the proceeding in the suit of the petitioner, and not of the state. But the appellees rely on a supposed distinction between the use of the word "cases" and the word "controversies" in the section of the constitution defining the federal judicial power. That section uses the word "cases" in the first three clauses, namely, "cases, in law and equity," arising under the constitution and the laws and treaties of the United States, "cases affecting ambassadors, other public ministers and consuls," and "cases of admiralty and maritime jurisdiction." So far it has relation mainly, although not entirely, to the subject-matter of the litigation, and not to the parties involved. It then changes to the word "controversies," and uses this with reference to "controversies to which the United States shall be a party," "to controversies between two or more states," and then, without repeating the word, continues, "between a state and citizens of another state; between citizens of different states; between citizens of the same state claiming lands under grants of different states, and between a state, or the citizens thereof, and foreign states, citizens or subjects." The eleventh amendment to the constitution, which limits the judicial power of the United States with reference to the states, provides that it shall not extend "to any suit" of the class described in it. As to the change in phraseology found in this amendment, the

supreme court very soon,—that is, in 1821,—in Cohens v. Virginia, 6 Wheat. 264, after great deliberation, determined in effect that the word "suit" is not so broad as the word "controversy," because the court maintained its jurisdiction on a writ of error, although the defendant was the state of Virginia; pointing out carefully that a proceeding in error is not a suit, although it cannot be denied that it is a controversy. Mr. Justice Iredell, in Chisholm v. Georgia, 2 Dall. 419, 431, 432, distinguished between the word "controversies" and the word "cases," in this connection, by confining the former to such as are of a civil nature; and Mr. Justice Story, in the first edition of his Commentaries on the Constitution, both in the text, at section 1634, and in the note to section 1668, recognized the possibility of this distinction, but did not positively approve or disapprove it. It has been suggested that the word "all," used in connection with the word "cases," and omitted in connection with the word "controversies," has peculiar force. This does not seem well sustained, but if it were it would not touch the question we are considering. The change under consideration, from the word "cases" to the word "controversies," will be found to have been a mere matter of style, and to have no relation to any limitation or extension of the class of questions to be adjudicated. As we have already said, so long as this section of the constitution speaks especially with reference to the nature of the questions involved, it uses the word "cases," but, when it considers more particularly proceedings having relation to the existence of parties, it uses the word "controversies," probably because, when parties are spoken of as arrayed against each other, literary style suggested the change. A lengthy examination of its history is excusable, because of the interesting character of the topic, and of the clear result to which it brings us. Prior to the adoption of the Articles of Confederation, the powers exercised by congress were of a revolutionary character, and were not accurately defined. Their growth and general features were well explained in Penhallow v. Doane, 3 Dall. 54. It was said that:

"The powers of congress at first were, indeed, little more than advisory; but in proportion as the danger increased they were gradually enlarged, either by express grant, or by implication arising from a kind of undefined authority suited to the unknown exigencies that might arise."

Mr. Justice Iredell, in his opinion, on page 92, touching the power of the Congress of the Confederation in prize appeals, said:

"It never was considered that before the actual signature of the Articles of Confederation a citizen of one state was, to any one purpose, a citizen of another. He was, to all substantial purposes, as a foreigner to their forensic jurisprudence. If rigorous law had been enforced, perhaps he might have been deemed an alien, without an express provision of the state to save him. And as an unjust decision upon the law of nations in the case of a foreigner to all the states might, if redress had not been given, have ultimately led to a foreign war, an unjust decision on the same law in one state, to the prejudice of a citizen of another state, might have ultimately led, if redress had not been given, to a civil war,—an evil much the more dreadful of the two. I have made these observations merely as to the propriety that this power should have been delegated, and therefore to show that, if it was assumed without adequate authority, it was not an arbitrary and unnatural assumption of a power that ought exclusively to belong to a single state."

This was a distinct shadowing out of the necessity of the exercise of federal judicial power with reference to every question which might arise between citizens of different states. The Congress of the Confederation did not go, in terms, to that extent, but it did in spirit, because its resolutions of March 6, 1779, embraced the following:

"That congress is by these United States invested with the supreme sovereign power of war and peace; that the power of executing the law of nations is essential to the sovereign supreme power of war and peace; that the legality of all captures on the high seas must be determined by the law of nations; that the authority ultimately and finally to decide in all matters and questions touching the law of nations does reside and is vested in the sovereign supreme power of war and peace."

The context shows that congress had especially in mind in these resolutions prize cases, or, at the most, causes arising under the law of nations, so far as it relates to war and peace; but the underlying principle announced may be involved in any controversy between citizens of different states, who, as the law is now well settled, are entitled in the federal tribunals, under very many circumstances, to appeal, as against each other, to the general commercial law and the rules of international jurisprudence.

The first official appearance of this topic in the convention which framed the constitution was in the ninth of the resolutions of Mr. Randolph, which formed the basis of its deliberations. Nearly all of this resolution, which subsequently became the thirteenth, and afterwards the sixteenth, was akin to those portions of the section of the constitution under consideration, which had more in view the subject-matter of litigation than the parties; and it used the word "cases," except at the very last, where it enlarged to the expression, "and questions which involve the national peace or harmony." This expression is very important, as it ran throughout the proceedings, until they came down to the mere matter of arrangement and style. The following appears (Madison's Debates, p. 332) to have occurred July 18th:

"The thirteenth resolution, 'The jurisdiction of the national judiciary,' etc., being then taken up, several criticisms having been made on the definition, it was proposed by Mr. Madison so to alter it as to read thus: 'That the jurisdiction shall extend to all cases arising under the national laws, and to such other questions as may involve the national peace and harmony,'— which was agreed to, nem. con."

In this broad form, using the sweeping word "questions," than which no word could more explicitly cover every issue of a judicial character, this subject-matter went, without further amendment or discussion, to the committee of detail, as the sixteenth resolution officially sent to it as agreed to by the convention. The committee of detail, of which Mr. Randolph himself was a member, was appointed July 21st, in accordance with the following proceedings:

"It was moved and seconded that the proceedings of the convention for the establishment of a national government, except what respects the supreme executive, be referred to a committee for the purpose of reporting a constitution, conformably to the proceedings aforesaid, which passed unanimously in the affirmative."

The only amendments we need note, which were made by the convention in that part of the draft constitution, reported by the committee, touching the federal judicial power, were as follows: The words "in law and equity" were inserted; but if these were intended as anything more than to shut out, as a matter of greater caution, an implication of limitation, it is to be said that they affect only the word "cases," and not the word "controversies." The provision touching cases arising under the constitution and treaties, and that touching controversies to which the United States shall be a party, likewise came in by amendment. But, except the one relating to cases arising under the constitution, which evidently had been passed over by the committee of detail because the policy of the convention had not been settled in regard to it, these amendments were adopted, nem. con., and there is nothing to show that the failure of the committee to include them was anything more than a failure in detail. All the other amendments were verbal, and in no view was there anything in any of the amendments which affects the question we are considering. After this draft was completed by the incorporation of such amendments as the convention desired, it was sent, September 8th, to a second committee, which also was merely one of style and arrangement. Mr. Bancroft says of this committee as follows:

"The committee to whom the constitution was referred for the arrangement of its articles and the revision of its style were Johnson, Hamilton, Gouverneur Morris, Madison, and King. The final draft of the instrument was written by Gouverneur Morris, who knew how to reject redundant and equivocal expressions, and to use language with clearness and vigor; but the convention itself had given so minute, long-continued, and oft-renewed attention to every phrase in every section that there scarcely remained room for improvement, except in the distribution of its parts."

After the second committee reported, no amendment was made in this part of the constitution we are considering, except by striking out the superfluous word "both." The details of the work of the committee in framing section 2, art. 3, of the constitution, now under consideration, may easily be imagined. In addition to the resolutions which had been adopted, expressing the sense of the convention, there was sent to the committee of detail for its assistance, but without receiving in any way the approval of the convention, Charles Pinckney's draft of a constitution, and also the resolutions of William Patterson. Mr. Pinckney's draft, as it comes to us, is disputed, but no doubt it is sufficiently reproduced on this topic. This and Mr. Patterson's resolutions conformed to each other in certain verbal expressions touching the matter of Federal judiciary jurisdiction; each, throughout, using the word "cases." Mr. Pinckney's draft on this topic is said to have run on as follows:

"One of these courts shall be termed the 'Supreme Court,' whose jurisdiction shall extend to all cases arising under the laws of the United States, or affecting ambassadors, other public ministers and consuls, to the trial of impeachment of officers of the United States, to all cases of admiralty and maritime jurisdiction."

As is well understood, the matter of trials of impeachments dropped out; yet, so far as the rest is concerned, it is apparent that section 2 was framed from Mr. Pinckney's draft, so far as that draft went. But, in order to carry out the direction of the convention touching "such other questions as involve the national peace and harmony," it was necessary to add what further appears, covering questions between various parties; and at this point the word "controversies" was introduced, undoubtedly only for the reason we have already stated.

In this historical sketch we have made no reference to the Articles of Confederation, as they were confessedly of a limited and peculiar character. Our conclusion is that this history of the proceedings of the convention shows a settled purpose to include within the federal judicial jurisdiction all "questions which involve the national peace and harmony," and that the word "questions" includes every issue capable of a judicial determination.

The rulings of the supreme court have been in the direction of the view which we take. In Smith v. Adams, 130 U. S. 167, 9 Sup. Ct. 566, Mr. Justice Field groups together, within the same quotation marks, the words "cases" and "controversies," as though they were entirely interchangeable, and he says (page 173, 130 U. S., and page 566, 9 Sup. Ct.), "Whenever the claim or contention of a party takes such a form that a judicial power is capable of acting upon it, then it has become a case or controversy." In Interstate Commerce Commission v. Brimson, 154 U. S. 447, 14 Sup. Ct. 1125, the supreme court cites, on page 475, 154 U. S., and page 1125, 14 Sup. Ct., with approval, this phraseology of Mr. Justice Field, and itself, on the same page, and on page 478, 154 U. S., and page 1125, 14 Sup. Ct., uses the same words as interchangeable. It must be admitted that both of these decisions should be classed as relating to cases in law and equity arising under the laws of the United States. These expressions, therefore, so far as the case at bar is concerned, might be regarded as dicta, yet the cases touching the writ of habeas corpus itself come directly in point. In Holmes v. Jennison, 14 Pet. 540, it was held that this proceeding constitutes a "suit," within the meaning of that word, as used in the judiciary act of 1789, § 25 (1 Stat. 85). In Kurtz v. Moffitt, 115 U. S. 487, 6 Sup. Ct. 148, the court, on page 494, 115 U. S., and page 148, 6 Sup. Ct., said, "A writ of habeas corpus sued out by one arrested for a crime is a civil suit or proceeding, brought by him to assert the civil right of personal liberty against those who are holding him in custody as a criminal." Ex parte Milligan, 4 Wall. 2, is still more in point. On page 112 the court said: "In any legal sense, 'action,' 'suit,' and 'cause' are convertible terms. Milligan supposed he had a right to test the validity of his trial and sentence, and the proceeding which he set in operation for that purpose was his 'cause' or 'suit.'" The court goes on at considerable length to develop this proposition. Thus it was determined in advance that the pending case is a suit, and therefore a controversy, and also that it is the suit, not of the state, but of the petitioner.

We now come to the question whether congress has vested in the circuit courts of the United States the power which it might constitutionally so vest, to issue the writ of habeas corpus under the circumstances shown by the pleadings now before us, as we have construed them.  Before proceeding to examine the history of the legislation of congress and the decisions of the supreme court, it is necessary that we consider the rules for determining the weight to be given the various expressions in the opinion in Re Burrus, 136 U. S. 586, 10 Sup. Ct. 850, already referred to.  That case arose from a proceeding on habeas corpus, which was determined by the supreme court to have originated in a district court, touching the custody of a child, upon a dispute with reference thereto between its grandfather and its father.  The only question necessarily involved was essentially distinct from that in the case at bar, as we have already shown, and jurisdiction could be maintained in the latter without at all involving the judgment in the former.  Evidently, the supreme court would not regard itself as bound by In re Burrus, beyond what was actually determined by it.  There have been numerous instances where certain dicta, especially of the English judges, and certain decisions of the king's bench, common pleas, or exchequer, and even certain rulings at nisi prius, have fitted the state of the law so aptly, or have been acquiesced in so long, that they ultimately have been recognized as law, even by the house of lords.  Yet, although this court is subject to correction by the supreme court, and although it is bound by any solemn determination by it, nevertheless, in contemplation of law, it is classed among courts of final jurisdiction, and is not only permitted, but even required, to weigh independently all unnecessary expressions, and to refrain from aiding them to crystallize into permanent legal deformities.  On this topic we stated, in Beal v. City of Somerville, 1 C. C. A. 598, 50 Fed. 647, on page 652, 50 Fed., and page 598, 1 C. C. A., as follows:

"There are many dicta and general expressions touching this matter, some of which had in view the solving of other issues, and some of which were built up from the first class without recognizing the method of its origin.  So far as this appeal is concerned, this court must maintain itself as a tribunal of final jurisdiction, notwithstanding the possibility that it may in some form reach the supreme court.  If we had a determination in point from that court, it would necessarily conclude us; and, if the question at issue had been met by the United States circuit court of appeals in any other circuit, we should, of course, lean strongly to harmonize with it; but we are obliged to proceed without either.  Although, whenever the law is very doubtful, or the propositions complicated, this court may derive great aid from dicta, expressions of learned judges or text writers, or decision of local tribunals, it cannot permit itself to be bound or embarrassed by them, when the facts naturally and easily lead to such just conclusions as we now seem required to accept."

In Cohens v. Virginia, 6 Wheat. 264, Chief Justice Marshall said, on page 399, as follows:

"It is maxim not to be disregarded that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.  If they go beyond the case, they may be respected, but ought not to

control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court was investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated."

Since these observations were made, there has been a vast increase in the number of cases coming before the courts for decision, which has necessarily increased correspondingly the liability that opinions—even those filed in behalf of the whole court—may contain expressions which were not necessary to the adjudications, and which have not received the approval of all the judges concurring. A striking instance of this character, with a subsequent illustration of the proper method of dealing with it, appears in Landes v. Brant, 10 How. 348. The opinion in that case held that a certain judgment could not be attacked collaterally, and gave reasons therefor which were sufficient. The opinion afterwards continued, on page 371, as follows:

"Furthermore: This suit in ejectment is collateral to the judgment, and it cannot be impeached collaterally. So the supreme court of Missouri held in 1848, in the case of Landes v. Perkins, 12 Mo. 254, on the same title, and a similar record in all respects to that before us, and with the views on this point there expressed we entirely concur."

In one sense this was not a mere dictum, because it was in the line of consideration of the question involved; and, from the standpoint of the opinion itself, the other reasons given for the conclusion of the court might have been stricken out, leaving this as a necessary link in the logical chain. Yet, in Thompson v. Whitman, 18 Wall. 457, 464, this paragraph was rejected, for the reasons that it was unnecessary, and had been in effect overruled. Another marked case is Cross v. Burke, 146 U. S. 82, 13 Sup. Ct. 22, in which the court said, on pages 86 and 87, 146 U. S., and page 22, 13 Sup. Ct., as follows:

"It was to this act that Mr. Justice Miller referred in Wales v. Whitney, 114 U. S. 564, 565, 5 Sup. Ct. 1050, as 'restoring the appellate jurisdiction of this court in habeas corpus cases from decisions of the circuit courts, and that this necessarily included jurisdiction over similar judgments of the supreme court of the District of Columbia.' But the question of jurisdiction does not appear to have been contested in Wales v. Whitney, and where this is so the court does not consider itself bound by the view expressed."

The courts of appeals in the various circuits will find sufficient difficulties, without also shirking their duty, on proper occasions and under proper limitations, to sift out from the real judgments of the supreme court what was not necessary thereto, and to deal with the same in a proper spirit of investigation. The result of these observations will be returned to when we come to examine In re Burrus, already referred to, in its proper historical place in the line of statutes and decisions touching the question of jurisdiction now before us.

There probably was no topic which went into the constitution of the United States, or into the early constitutions of the various states, about which their framers were more anxious than that

of the right to the great writ of habeas corpus ad subjiciendum. The provision of the federal constitution that "the privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it" (article 1, § 9), is one to which congress cannot give complete effect except through the federal tribunals. For congress to have refused or omitted to vest the power to issue this writ would have been a suspension of the writ in advance; and, so far as it might refuse or omit to vest it to the full extent of its constitutional authority to do so, it would be the equivalent of such suspension pro tanto. In Ex parte Bollman, 4 Cranch, 75, Chief Justice Marshall, referring to this constitutional injunction, said, on page 95:

"Acting under the immediate influence of this injunction, they [the congress] must have felt, with peculiar force, the obligation of providing efficient means by which this great constitutional privilege should receive life and activity, for if the means be not in existence the privilege itself would be lost, although no law for its suspension should be enacted."

Also, in Ex parte Yerger, 8 Wall. 85, the court said, on page 95:

"In England, all the higher courts were open to applicants for the writ [meaning the writ of habeas corpus], and it is hardly supposable that under the new government [meaning the United States], founded on more liberal ideas and principles, any court would be intentionally closed to them."

Again it said (page 96):

"It would have been indeed a remarkable anomaly if this court, ordained by the constitution for the exercise in the United States of the most important powers in civil cases of all the highest courts of England, had been denied, under a constitution which absolutely prohibits the suspension of the writ, except under extraordinary exigencies, that power in cases of alleged unlawful restraint which the habeas corpus act of Charles II. expressly declares those courts to possess."

The presumption therefore stands that congress would intend to vest in its judicial tribunals, and, if necessary, part in one and part in the others, the entire jurisdiction permissible under the constitution, so far as it appertains to this writ. It follows that all general expressions touching all that part of the constitutional jurisdiction relative to this writ which could not be vested in the supreme court are to be construed subject to the presumption that it was intended by congress to be vested in some other judicial tribunal. On this point, Chief Justice Marshall, in Ex parte Bollman, said further, on page 96:

"Whatever motives might induce the legislature to withhold from the supreme court the power to award the great writ of habeas corpus, there could be none which would induce them to withhold it from every court in the United States."

In accordance with this presumption, the statute was framed as soon as possible after the organization of the new government, commonly known as the "Judiciary Act,"—Sept. 24, 1789, c. 20 (1 Stat. 73),—containing the following, and which refers to the supreme court, the circuit courts, and the district courts:

"Sec. 14. And be it further enacted, that all the before mentioned courts of the United States, shall have power to issue writs of scire facias, habeas corpus, and all other writs not specially provided for by statute, which may

be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law. And that either of the justices of the supreme court, as well as judges of the district courts, shall have power to grant writs of habeas corpus for the purpose of an inquiry into the cause of commitment. Provided, that writs of habeas corpus shall in no case extend to prisoners in gaol, unless where they are in custody, under or by colour of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify."

Although it would seem that this provision of law should have had the broadest construction, in view of the presumption to which we have already referred, it was always regarded as possessing some obscurity. Ex parte Burford, 3 Cranch, 448, 449. First, it was denied that the writs of habeas corpus specified were the great writs of ad subjiciendum; second, it was claimed that, like the writs not enumerated, they could be made use of only as incidental to jurisdiction acquired in a pending cause; and, third, that the word "commitment," used in section 14, in direct connection with the power vested in justices and judges, referred back to and controlled the powers vested in the courts themselves, and, moreover, had a narrow, technical meaning, to such an extent as to prohibit the writ except in behalf of persons in custody on criminal or civil process. Indeed, some authorities have gone so far as to maintain that unlawful restraint on civil process was not within the purview of this section. It would seem that Ex parte Bollman should have been understood as sweeping away the more substantial of these doubts. Certainly, that case held that the writs specified in the statute included the writ ad subjiciendum. It ought also to have been understood as disposing of the proposition that the power to issue the great writ was limited to such as were necessary to enable the courts to exercise their respective jurisdictions in pending causes; in this respect, distinguishing from writs of mandamus, and other writs not specified in the section cited. McIntire v. Wood, 7 Cranch, 504; Rosenbaum v. Bauer, 120 U. S. 450, 7 Sup. Ct. 633. Ex parte Wilson, 6 Cranch, 52, has been cited and relied on as establishing, to its full length, the proposition that this writ could not issue under the judiciary act unless there was a commitment on a criminal process, although Chief Justice Marshall, who spoke for the court in that case, afterwards, in 1833, in Ex parte Randolph, 2 Brock. 447, Fed. Cas. No. 11,558, sitting in the circuit court, united in discharging the petitioner from custody under a treasury warrant. The effect of the opinion of the chief justice in Ex parte Bollman was clearly understood by Mr. Justice Story to sweep away all these doubts, because, in the first edition of his Commentaries on the Constitution, published in 1833, he said, in section 1335, "Congress have vested in the courts of the United States full authority to issue this great writ in cases falling properly within the jurisdiction of the national government." In subsequent editions of his work this expression was repeated in the same terms. Yet some of the doubts and refinements to which we have referred were subsequently persisted in, and are found in authors of such respectability as Hurd on Habeas Corpus, at various points. Judge Betts, in Re Barry, 136 U. S. 613, 42 Fed. 113, although conceding

that Ex parte Randolph decided that the writ lies to inquire into the cause of commitment, if made on a civil process, still insists on his doubt touching this proposition. Under these circumstances it becomes necessary to consider the effect of the rearrangement in the Revised Statutes of the provisions of the judiciary act touching writs of habeas corpus, and the purging which they there received of some of the expressions referred to, on which these doubts have been built up.

It will be noticed, first of all, that in the revision the enactment touching the writ of habeas corpus was dislocated from that touching all others, and from that touching the powers of justices and judges, so that we find an entire section as follows:

"Sec. 751. The supreme court and the circuit and district courts shall have power to issue writs of habeas corpus."

So much of the judiciary act as related to the issue of other writs appears in section 716, and the supposed limitation arising out of the word "commitment" in section 752. Thus, whatever doubt could be raised by the grouping in the act of 1789 disappears, unless we are compelled to hold that the ordinary rule applies to this case,— that the Revised Statutes did not intend to change the law.

Another marked departure is found in the next provision of the Revised Statutes, as follows:

"Sec. 752. The several justices and judges of the said courts within their respective jurisdictions shall have power to grant writs of habeas corpus for the purpose of an inquiry into the cause of restraint of liberty."

In this the word "commitment," so much relied on as restricting the effect of the original statute, disappears, and the words "restraint of liberty" take its place,—a change of a marked character.

It is claimed by the appellees that, notwithstanding these changes, the usual rule applies here,—that a revision does not affect the law; and for this the appellees cite section 5600 of the Revised Statutes, and state that In re Burrus, 136 U. S. 586, 10 Sup. Ct. 850, treated the effect of the old and new statutes as identical. We fail to find this, and we have not been referred to the page where it occurs, if at all. Section 5600 has a very narrow effect, and clearly does not extend to cases of change of phraseology, as it is expressly limited to matters of arrangement and classification. On the other hand, there is enough in these changes to overcome the ordinary presumption about revisions, and to support the use in this case of the rule given in U. S. v. Bowen, 100 U. S. 508, and applied in a very marked way to a change in the removal statutes, in Iron Co. v. Ashburn, 118 U. S. 54, 57, 6 Sup. Ct. 929, as follows:

"The Revised Statutes of the United States must be accepted as the law on the subjects which they embrace as it existed on the 1st of December, 1873. When their meaning is plain, the court cannot recur to the original statutes to see if errors were committed in revising them, but it may do so when necessary to construe doubtful language used in the revision."

But we are not left to presumptions pro and con. The act of June 27, 1866, c. 140 (14 Stat. 74), initiating the revision of the federal laws, contained, in section 2, directions to the commissioners

"for making such alterations as may be necessary to reconcile the contradictions, supply the omissions, and amend the imperfections of the original text." The third section also provided for submitting to congress the result of their labors, and said that "at the same time they shall also suggest to congress such contradictions, omissions, and imperfections as may appear in the original text, with the mode in which they have reconciled, supplied and amended the same." Reports of commissioners of revision, suggesting changes which have been adopted, have been constantly accepted in Great Britain, and in the various states in this country, for aiding the construction of the statute as changed, even when less specific provisions were made for amendments, and for stating the reasons thereof, than are found in the statute last referred to. There can be no doubt, therefore, that under this statute, whenever the commissioners have stated in their report reasons for changing the text, accompanied with amendments which have been followed by their adoption by congress, it must ordinarily be held that there was an intention to change, and that the report aids in the construction of the new statute.

Touching what is now section 751 of the Revised Statutes, the report of the commissioners, which will be found in the edition of 1872, under title 13, commencing on page 133, is very full; and its effect is of a decided character, and works out a clear result. These words should perhaps be qualified to some degree as to the use of the words "cause of restraint of liberty," appearing in section 752, in lieu of the original words of the judiciary act, "cause of commitment." We will therefore interpose at this point to say, as to these expressions, that certainly the changed phraseology will allow writs of habeas corpus to stand, and that at common law they do stand, for all unlawful restraints, whether under color of process, or through the illegal acts of individuals, or under such commitments as are found in the case at bar. The conclusions which have suggested any different view, arose from accepting the statute of 31 Car. II. c. 2, as being in lieu of the whole common law on this subject, while its purpose was to improve only a part of it. High and unquestionable authority sustaining the generally understood proposition that the common law extended the writ of habeas corpus to every case of illegal restraint is found in 2 Kent, Comm. *26, and sequence, and some of the most eminent supporters of this proposition are referred to by Judge Barbour in Re Randolph, 2 Brock. 447, 476, 477, Fed. Cas. No. 11,558, already referred to.

To return to the commissioners' report, among other things it is to be noted that it refers to the expressions in Ex parte Yerger, 8 Wall. 85, appearing on page 101, as follows:

"The great and leading intent of the constitution and the law must be kept constantly in view upon the examination of every question of construction. That intent, in respect to the writ of habeas corpus, is manifest. It is that every citizen may be protected by judicial action from unlawful imprisonment. To this end the act of 1789 provided that every court of the United States should have power to issue the writ. The jurisdiction thus given in law to the circuit and district courts is original. That given by the constitution and the law to this court is appellate. Given in general terms, it must

necessarily extend to all cases to which the judicial power of the United States extends, other than those expressly excepted from it."

The commissioners cite the last clause of this citation. Then they use this language:

"Now, the constitution declares that 'the judicial power shall extend,' not only 'to all cases in law and equity, arising under this constitution, the laws of the United States, and treaties made, or which shall be made, under their authority,' but to * * * controversies 'between a state or the citizens thereof, and foreign * * * citizens or subjects.' "

They afterwards touch on the question of parens patriae, and conclude, as follows:

"It is assumed, then, in this revision that the writ authorized by the judiciary act would have applied to every case of restraint of liberty to which the judicial power of the United States extended, but for the restrictive effect of the proviso, which forbade all interference with prisoners in jail under state authority, except when they were needed as witnesses in the courts of the United States, and that the only effect of the subsequent acts has been to do away with this restriction in the cases which they specify. For this reason they have been stated in a separate section, and consolidated with the proviso to the fourteenth section. At the same time it has been held that the later acts require the substitution of the words 'restraint of liberty' for the words 'cause of commitment.' "

Clearly, they intended to remove the doubts which had been built up touching section 14 of the judiciary act, to which we have already referred, and purge its language, and extend the jurisdiction of the federal courts to every class of restraint to which the judicial power of the United States extends, including that based on the mere matter of diverse citizenship, not necessarily or expressly excepted. They so reported to congress; they adopted language apt and effective for that purpose; and congress, by accepting that language, has effected their purpose. In this connection, we have not considered the intervening statutes touching the writ of habeas corpus, and we have no occasion to do so. They consist mainly of exceptions to the provision at the close of section 14 of the judiciary act. They throw no direct light on the question involved in this case, and are not of any indirect value, except to indicate that the improvements in the law which we insist occurred in the sections of the Revised Statutes referred to were in harmony with a general policy to broaden out the privilege of the writ of habeas corpus, shown by all the legislation of congress.

The provisions of the original judiciary act having thus been purged of the doubts to which we have referred, and the sweeping phraseology of sections 751 and 752 having been substituted in lieu thereof, we will consider whether any other difficulties remain in the way of the exercise by the court below of jurisdiction in this case. Almost immediately after the organization of the supreme court, it asserted, under the general grant of power to issue writs of habeas corpus contained in the judiciary act, the entire jurisdiction which could be vested in that court under the limitations of the constitution. The first case was that of U. S. v. Hamilton, 3 Dall. 17, in which the supreme court reviewed, on a writ of habeas corpus ad subjiciendum, the action of the district court for the district of

Pennsylvania in committing a person charged with high treason. The report does not show that the question of jurisdiction was particularly considered. But in Ex parte Bollman, 4 Cranch, 75, Chief Justice Marshall said, on page 100, that Hamilton's Case was expressly in point on that question; adding that it was several days under advisement, and the question could not have escaped the attention of the court. In Ex parte Bollman the question was examined at length, and it was held, in substance, that there was no restraint lying against the issue of writs of habeas corpus ad subjiciendum by the supreme court, except the constitutional limitations on its jurisdiction. In Ex parte Watkins, 3 Pet. 193, 7 Pet. 568; and Ex parte Milburn, 9 Pet. 704,—the same question was again brought before the court, and with the same result. The last three cases are of special importance, because Mr. Justice Story sat in each of them. So that, when he gave the rule in the broad terms we have cited from his Commentaries on the Constitution, we must infer that he fully understood the views of the supreme court touching this subject-matter. The underlying principle of these decisions has always been acted on by the supreme court, although there have been, from time to time, questions whether or not, in some particular case, the jurisdiction assumed by it was properly appellate,—questions which were particularly considered in Re Kaine, 14 How. 103. The whole line of these early decisions was referred to and acted on in Ex parte Lange, 18 Wall. 163, the first important case of the series of like cases which have followed it, where the supreme court has, on habeas corpus, discharged a person in custody under a void judgment of the district or circuit court, within which class In re Burrus, 136 U. S. 586, 10 Sup. Ct. 850, already referred to, also falls. Chief Justice Marshall, in Ex parte Watkins, 3 Pet. 193, said, on page 201, that "no law of the United States prescribes the cases in which this great writ shall be issued." This applies alike to the supreme court and the circuit courts, and, if the former found no lack of statute authority for issuing the writ of habeas corpus, why should the latter find such lack? It is conceded on all sides that although the supreme court finds its existence in the constitution, while no specific inferior court does, yet it cannot exercise jurisdiction beyond that expressly vested in it by statute, and in this particular it stands precisely like each of the inferior courts. This was firmly settled in its early decisions, having been formally stated at length as early as Rhode Island v. Massachusetts, 12 Pet. 657, 721, and it was the basis of almost the entire discussion of that court touching this very writ in Ex parte Bollman. In all particulars, the supreme court and the circuit courts, so far as this topic is concerned, stand in precisely analogous positions under the judiciary acts. As already said, neither can exercise any powers not vested in them by statute. The powers of each were carefully defined and limited in the judiciary act of 1789, and each was recognized by it as a common-law court of the superior grade, and the circuit court clearly established as such. The fact that each also exercises to a certain extent, on appeal, jurisdictions not known to the common

law, does not change their characteristics in this particular, any more than the house of lords ceased to be the great common-law court of England when it was vested by the judicature act with jurisdiction over admiralty appeals. On the other hand, under the original judiciary act, the district courts, although clothed to a limited extent with certain common-law powers, were essentially courts of admiralty and maritime jurisdiction. Whether or not, on this account, a distinction could properly be made against the district courts, we need not determine. Such a distinction seems to have been suggested, if not made, in Re Burrus, 136 U. S. 586, 596, 597, 10 Sup. Ct. 850, where it is said that the jurisdiction of the district court is not founded on the citizenship of parties.

On the whole, we can perceive nothing which prevents applying to the circuit courts the full force of the decisions we have cited, by virtue of which the supreme court has exercised the power of issuing this writ to the full extent of its judicial jurisdiction permitted by the constitution. While, in view of the doubts that have been expressed throughout the judicial history of the United States, and the careful avoidance by the supreme court of a determination of the issue in advance of its being directly presented to it, we have investigated this question with great anxiety, and consequent care and patience, we cannot avoid the conclusion that the power granted by the judiciary act of 1789, as remodeled by sections 751 and 752 of the Revised Statutes, goes to the entire extent of the jurisdiction which congress could, under the constitution, vest in the supreme court or the circuit courts, except as expressly excluded by other provisions of statute, and except as also necessarily excluded by the inherent nature of the courts themselves, and of the machinery given them by law with which to work out practical results. There is no such express exclusion by other statutes reaching this case; and, as already explained, there is nothing in the latter exception which, so far as the circuit courts are concerned, bars them from exercising jurisdiction over the simple issue of alleged illegal restraint, which we interpret the record in this case to have presented.

We have asked ourselves where the line is to be drawn, if at all. In Ex parte Bollman, ubi supra, the supreme court decided that the writs of habeas corpus named in the statutes we are considering included the great writ; and in Ex parte Watkins, 3 Pet. 193, it used the expression we have already cited,—that no law of congress prescribes the cases in which this writ shall issue. We have asked ourselves, therefore, what part of this field the circuit court occupies, if it does not occupy the whole, and we are unable to find any assistance in answering this question. Therefore, we hold that the circuit court had jurisdiction over the petition in the record, and over the writ issued in consequence thereof. As we have already held in the opinion passed down June 4, 1894, that this court has full jurisdiction on this appeal, it only remains for us to retain it, consider the merits of the case, and reverse, affirm, or modify the judgment of the circuit court as it may require.

In this connection, we have not deemed it necessary to refer

more particularly to the decision of Judge Betts in Re Barry, 136 U. S. 597, 42 Fed. 113, and rendered in May, 1844; or to that of Judge McAllister in Ex parte Des Rochers, 1 McAll. 68, Fed. Cas. No. 3,824, rendered in 1856; that of Judge Leavitt in Ex parte Everts, 1 Bond, 197, Fed. Cas. No. 4,581, rendered in 1858; or that of Judge Deady in Bennett v. Bennett, Deady, 299, Fed. Cas. No. 1,318, rendered in 1867. All these cases related to the doctrine of parens patriae, except that of Ex parte Des Rochers, which was directly in point on the case now before the court, and reached the same result which we have. Moreover, we have not deemed it necessary to comment on them, because none of 'them are authoritative, they are conflicting, and they have long since passed into the general body of discussion which this topic has involved. In U. S. v. Green, 3 Mason, 482, Fed. Cas. No. 15,256 (decided in 1824), Mr. Justice Story took jurisdiction on habeas corpus to dispose of the custody of a child; but the case involved no discussion of the question before us, and we have already sufficiently referred to his views in the citations made from his Commentaries on the Constitution. That part of In re Burrus, 136 U. S. 586, 10 Sup. Ct. 850, already referred to, which went beyond the case immediately before the court, which case touched only the custody of a child, may be said to involve an inference against the jurisdiction of the circuit court, because it is not easy to see why, if the jurisdiction of the district court is cut down, that of the circuit court, which stands on the same general statute authority, should remain unlimited. Yet the expressions which we have cited from the case apparently rebut this inference. We are compelled, however, to refer to what we have already said touching expressions, even those of the supreme court, not necessary to the determination of the issue. It cannot be controverted that the sole issue in Re Burrus was the power of the district court to exercise jurisdiction parens patriae. The opinion, to a large extent, adopts the opinion of Judge Betts, already referred to. While he discussed at great length various questions which we have discussed, his conclusions were summed up (page 626, 136 U. S., and page 850, 10 Sup. Ct.) as follows:

"(1) If granted [meaning the writ of habeas corpus, and a return was made admitting the facts stated in the petition], I should discharge the infant, on the ground that this court cannot exercise the common law function of parens patriae; and has no common-law jurisdiction. (2) Because the court has not judicial cognizance in the matter by virtue of any statute of the United States."

That was the real issue before him, although it is true that the supreme court, on page 594, 136 U. S., and page 850, 10 Sup. Ct., uses the following language:

"Mr. Barry then made application to the circuit court of the United States for the southern district of New York, where his case was heard by Judge Betts, who delivered a very careful and a very able opinion, which has been furnished to us, in which he held that his court could not exercise the common-law function of parens patriae, and therefore had no jurisdiction over the matter, nor had it jurisdiction by virtue of any statute of the United States."

On the whole, in view of the considerations which we have stated in an earlier portion of this opinion, we feel ourselves unauthorized to accept In re Burrus beyond the issue solemnly determined in the case, which was that the district courts of the United States have not jurisdiction, parens patriae, to issue the writ of habeas corpus.

Although this is a common-law proceeding, yet we have no doubt that it was properly removed from the circuit court to this court by appeal, as distinguished from a writ of error. As the issues were left by our opinion passed down June 4th, and by what we have said touching them in this opinion, the case is not one of the classes to be taken to the supreme court under any provision of law existing when this court was established. Yet, for the reasons stated in this opinion filed June 4th, it may be taken to this court. There is no law directing the form of removing this particular case to this court, but, so far as the statutes make provision for any cases, it is by appeal. Rev. St. §§ 763, 764; Act March 3, 1885, c. 353 (23 Stat. 437). It would be an anomaly of the law to have cases not thus provided for come up by a different method, involving the exercise of essentially different powers on the part of this court. Our rule 33, which, it is well known, was adopted with the approval of the justices of the supreme court, evidently contemplates that there is no method of removing a proceeding on habeas corpus to this court except by an appeal. Moreover, this form of proceeding brings the entire case to the appellate court (Ex parte McCardle, 6 Wall. 318, 327; In re Neagle, 135 U. S. 1, 42, 10 Sup. Ct. 658), and is thus in favor of liberty. We, therefore, hold that this proceeding should be by an appeal, and not by writ of error. No question of this sort was raised at the argument, and neither was it noticed in our former opinion, but we deem it proper to cover it.

Certain proceedings on habeas corpus, on behalf of the present petitioner, in the supreme judicial court of Massachusetts, which resulted in an appeal, disposed of by the opinion in King's Case, 161 Mass. 46, 36 N. E. 685, have been set up in the return on this writ. Although that petition, like the one at bar, was brought by a next friend, yet, as the writ issued on it, and King was actually taken into the custody of the court, the case thereupon became his case, as was determined in the opinion referred to. Consequently, the result would constitute res adjudicata, except for the fact that in Massachusetts the rule ordinarily held seems to apply, —that a refusal of a discharge on habeas corpus is not a bar to a new petition. Bradley v. Beetle, 153 Mass. 154, 26 N. E. 429. What the result would be in the federal courts, where the entire case may be taken up on appeal as a matter of right, we need not determine. On the present state of the decisions, we are unable to find that the order finally entered in the proceedings in Massachusetts would be a bar in that state. Therefore, it cannot be in the pending case. The final order of that court directed that King should remain in the asylum where he was confined at the date of the petition. There would be some ground, therefore, for holding that this order con-

stitutes res adjudicata, and especially that it is a direction of a state tribunal, which a federal tribunal would be holden to regard, except for the fact that it seems to have been merely incidental to the discharge of the writ; and, indeed, it concluded with a formal dismissal of the proceedings. Thus, apparently, the substantial effect of the final judgment of the state court was merely the usual one of the dismissal of a petition in habeas corpus, and the status of the case at bar is the same as though the prior proceedings had not occurred.

The other issues raised in the case at bar are substantially as follows: The petition makes no express or specific allegation touching the sanity or insanity of King, but sets out that he was illegally held in the McLean Asylum under an order issued by the chief justice of the supreme court of Rhode Island in 1866. It also sets out an order of admission from the visiting committee of the Mc-Lean Asylum, and alleges that this is invalid; but this order is not relied on, and it need not be further noticed. The return, moreover, does not rely on the order of the chief justice of Rhode Island, but on the alleged facts that, at the time King was received into the McLean Asylum, he was violently and dangerously insane, and that at the time of the return he was insane, and unable to care for himself, and, in the absence of restraint and proper care, would be dangerous to himself. It also alleges a committal July 31, 1866, in accordance with chapter 223 of the Statutes of Massachusetts of 1862, especially an application of his brother and the certificate of two physicians, alleged to be in the form required by that act. The return, however, fails to make any reference to the act of 1865 (chapter 268), essentially modifying the act of 1862. In reply to this return it is alleged that the committal did not comply with the statute forms, and that the act of 1862 did not apply to the petitioner, because he was not at the time of the committal a citizen or resident of Massachusetts, and never had been. There seems some basis for these propositions.

However, none of these matters need be particularly considered, because, if the petitioner is now sane, or is capable of caring for himself, and also needs no hospital treatment, he is entitled to be discharged, whatever may have been the form of the committal, and if he is in the condition described in the return the irregularities would be of no consequence. Nishimura Ekiu v. U. S., 142 U. S. 651, 662, 12 Sup. Ct. 336. Whatever a state tribunal, having jurisdiction as parens patriae, might accomplish, especially in Massachusetts, where the statute authority given to judges of the higher courts touching the committing of insane persons to asylums would cover the case of a prior informal committal, and enable them to apply an immediate and practical remedy by a new one, the circuit courts have not the machinery to deal suitably with a person in the condition in which the petitioner is alleged in this return to be, and would therefore be prohibited, both by public policy and humanity, from merely discharging him from the custody in which he might be found. In such circumstances a court would be called on to exercise more than ordinary judicial powers, including those

possessed by the chancellor, as representative of the sovereign, or by virtue of his sign manual. But that these powers are not possessed by circuit courts sitting in equity was ruled in Fontain v. Ravenel, 17 How. 369, 384, already cited; and it follows, for even stronger reasons, that they do not possess them when sitting at common law. In Byers v. McAuley, 149 U. S. 608, 13 Sup. Ct. 906, it was held that the circuit court might establish a debt against an intestate estate, but could not administer. This illustrates the limitation we put on the jurisdiction of the circuit court in cases like this at bar. Fontain v. Ravenel was cited, and impliedly affirmed, in Late Corporation of the Church of Jesus Christ of Latter-Day Saints v. U. S., 136 U. S. 1, 10 Sup. Ct. 792. It was distinguished, but not doubted, in Russell v. Allen, 107 U. S. 163, 169, 2 Sup. Ct. 327. In any view, the essential issue on this record in the circuit court was the fundamental question of the mental and physical condition of the petitioner. On the coming in of the return, the petitioner's reply thereto was filed March 23, 1894. Thereupon, a motion for a guardian ad litem was made on the same day by the respondents; and an order was entered, setting out that the return alleged an advanced state of dementia, and that, while the answer to the return did not wholly admit this allegation, it did not fully deny unsoundness. The order proceeds that, without determining the charcter or extent of King's dementia, enough was found in the record to enable the court to determine that King was so far unsound as to render proper the appointment of a guardian to represent him, and to do all things necessary for the promotion and protection of his rights and interests in this regard. The following afterwards appears:

"Moreover, as the guardian may have the power to say whether this writ shall be further prosecuted,—a question upon which no opinion is now expressed,—I am," etc.

It next names a guardian, and proceeds as follows:

"And it is understood that he [the guardian] will examine into his [King's] rights and interests in this proceeding, and he will inquire particularly whether he is deprived of his liberty, or, in other words, whether his keeping and custody at the asylum is restraint."

Then the following appears:

"The guardian so appointed as the representative of an unsound person, being the responsible party petitioner, is expected to report whether he elects to treat the keeping and custody on the day on which the petition was filed, and now, as a matter of comfort and protection, in which King, through his guardian, acquiesces, or as forcible and offensive restraint. And the guardian is furthermore expected to elect whether this writ should be prosecuted further."

The closing sentence of the essential parts of this order is as follows:

"No evidence will be taken on any question in this proceeding until such report and election are made."

The report of the guardian was filed April 23, 1894. Meanwhile, the parties appeared before the court on several occasions touching

the time of the hearing.    This was first set for March 27th, and this follows in the record:

"On the 27th day of March, 1894, upon the request of the petitioner, it is ordered that the hearing in said cause be postponed until April 2, 1894, at 2 p. m.   On the 2d day of April, 1894, upon application of petitioner, counsel for respondent consenting thereto, it is ordered that the hearing in said cause be postponed until April 9, 1894, at 2 p. m.   On the 9th day of April, 1894, it is ordered that the further hearing be postponed until April 23, 1894, at 2 p. m."

It is plain that "the request of the petitioner," found in these orders, had no reference to the guardian ad litem, and that in these proceedings the petitioner was recognized, through counsel of record, or through his next friend, as distinguished from the guardian.   This shows that the order of March 23d was not intended to preclude the petitioner from further attendance on the court, through the next friend, or his counsel, or the court from taking such action as it might deem proper after receiving the guardian's report.   The provision that the guardian was "expected to elect whether this writ should be prosecuted further" must be construed in the light of what elsewhere appears, and must yield to the statement that the court expressed no opinion whether he would have the power to say whether the writ should be further prosecuted, and to the implication contained in the direction that no evidence would be taken on any question until the coming in of the report.   By these the court reserved the right to permit evidence to be taken after the report was made.   It is, therefore, clear that the court did not, by the order in question, surrender the case to the guardian, but still held it under its own control.   All that afterwards appears is very simple.   The guardian apparently understood the order of the court as we understand it, made no election, in the strict sense of the word, touching the progress of the cause, and used only advisory language as follows:

"Unless it seems to the court worth the while to try this experiment [referring to a certain proposed dealing with the petitioner], the guardian ad litem is of the opinion that it is not advisable to further prosecute this writ."

Thereupon, the entire balance of the record is as follows:

"This cause is thereupon heard by the court, the Hon. Le Baron B. Colt, circuit judge, sitting, and the following decree entered:   And now, to wit, April 23, 1894, this cause coming on to be heard by the court upon the report of John S. H. Frink, guardian ad litem, It is ordered and decreed, upon consideration thereof, that the writ of habeas corpus be discharged and that said King be remanded to the custody of the authorities of the McLean Asylum.

"By the Court:                                    Alex. H. Trowbridge, Clerk.

"From which decree an appeal is claimed by Edward Avery, Esq., on said twenty-third day of April, in open court."

.  This shows that the case was heard by the court on the report, and that "upon consideration thereof"—that is, of the report—the writ was discharged.   The record, however, fails to show that the petitioner or the next friend, or the counsel for the petitioner or next friend, or any person, offered to submit to the court any proofs bearing on the issue to be tried by it, or that there was any evidence

which, if offered, would have had any tendency to sustain that issue in behalf of the petitioner. On all this matter the record is a blank, and for aught that appears the court neither had, nor was offered anything, on which it could act, except the report, and nobody objected to the court's acting on that. The objections to these proceedings, set out in the assignments of error, may be divided into four: First, that the order appointing a guardian ad litem was without warrant in law and void; second, that he was improperly vested with authority to take the future conduct of the petitioner's case, to the exclusion of the petitioner, his counsel or attorney; third, that the order of reference to the guardian conferred on him authority to determine the law and facts, on' such evidence as he might choose to hear and consider, without opportunity on the part of the petitioner to meet the witnesses, or to present evidence on his own behalf; and, fourth, that the order directing the writ to be discharged, founded on the report of the guardian, without hearing evidence, was contrary to law and void. In so far as these assignments of error are based on the hypothesis that the powers given the guardian were of a final or conclusive character, they depart from the interpretation we have given the order of March 23d, and we need consider them no further.

Touching the first objection: The especial power of the court to supersede the next friend by a guardian ad litem is so well established that it requires no comment, except to say that it would be a reproach to the law if, in the case of a person unable, through weakness of intellect or age, to conduct his own litigation understandingly, the court had not the right to supersede a volunteer, when, in its just discretion, it finds it for the interests of the petitioner or plaintiff to do so. This is illustrated in Sale v. Sale, 1 Beav. 586, where the master of the rolls found that the next friend filed the bill to promote his own views, and said that he never had seen a more crafty attempt to defraud infants. We need make no distinction between infants and lunatics, with reference to the matters we are discussing, whatever the ancient law might have been. Story, Eq. Jur. §§ 1362, 1363. This power to make substitution is broad, and is necessarily exercised in a summary way; and there is no basis for the contention of the petitioner that it could not be done without notice to the next friend, or other formal proceedings. In the opinion filed in this case June 4th, we affirmed "the broad and flexible character of the rules of practice relating to next friends and guardians ad litem, and their adaptability to reach every case where they can be needed for the protection of those classes which they are intended to protect, or for effectuating natural justice." We agree with the conclusions involved in King's Case, 161 Mass. 46, 36 N. E. 685, already referred to, sustaining the right to supersede a next friend by a guardian ad litem, subject to the qualifications expressed in our prior opinion touching appeals under federal procedure. When any one sets on foot litigation by his own action, or when it appears that it is set on foot by a next friend because the petitioner or plaintiff is in close restraint, the proposition that his suit shall be put in

control of a guardian ad litem, on the ground that he is non compos mentis, may involve a fundamental right to be heard on a formal judicial issue.  But we have no occasion to consider generally the power or duty of courts to appoint guardians ad litem, because in this case the petition was filed by a next friend without any allegation that the petitioner was subject to such close confinement that he was unable to represent himself in court; so that the only excuse for proceeding by a next friend which can be gathered from the record is of such a character as necessarily included the right of the circuit court to continue the same person as next friend, or to supersede him by a guardian ad litem.

As to the other propositions in the assignments of error, we are of the opinion that, according to the common rules governing courts of law, as well as courts of equity, after it appears or has been determined that the petitioner or plaintiff is so far unsound that he must proceed by a next friend or guardian, the matters covered by those propositions are ordinarily within the discretion of the court. Many authorities on which the petitioner relies relate to the rule that the inheritance of an infant cannot be lost by the admissions of an attorney, the next friend, guardian ad litem, or any one assuming to act in any representative character, or of the infant himself. This cannot be denied, but it affords no support to the other proposition,—that the court has no power, of its own motion, to stay a suit in behalf of an infant, or of a person of unsound mind, which it is satisfactorily advised is frivolous, or will involve the petitioner or the plaintiff or his estate in unnecessary expense, or perhaps jeopardize his rights.  The next friend or the guardian ad litem is permitted to exercise a certain authority in determining these questions, but the court itself should be the ultimate authority; and it is inherent in the nature of the jurisdiction at common law over infants, idiots, and lunatics, that it should act with reference to them from its own conscience and on its own information, acquired in such way as it may deem it best to acquire it.  The final determination whether the suit shall be prosecuted or discontinued must necessarily be made by the court or its appointee, or else by a mere volunteer in the form of a next friend; and, if by the latter, it must, of course, be made in a summary manner, without the possibility of any judicial issue or investigation.  A just regard for the due protection of a person incapable of protecting his own interests would require that this action be taken by a responsible authority, as the court, and not by an irresponsible one.  While sometimes the proceedings take on a formal character, yet this is not necessary, nor inherent in the subject-matter, because whether it is for the interest of a person of unsound mind or of an infant that a suit brought in his behalf shall be prosecuted, is a question as to which, ordinarily, there can be no parties litigant entitled to be heard.  That the next friend is not such is stated in Daniell, Ch. Pr. (5th Ed.) *71, *72; and that none of the defendants are is clear, as a defendant ought not to be allowed, as of right, to intervene in this way in what may be for his own interest, as against what may be for the interest of an infant or a person of unsound mind.  This

does not relate to the matter of an original appointment of a guardian ad litem, the absence of whom in some cases it may be the right of the defendant to plead, and his duty to do so if he wishes to avoid a reversal on error coram nobis. Story, Eq. Pl. § 725. In Taner v. Ivie, 2 Ves. Sr. 466, Lord Hardwicke, on page 468, said that the masters "cannot, upon such references to them [meaning references touching the matters which we are discussing], hear the other side, against whom the bill is brought, but only judge, on circumstances prima facie, whether it is reasonable to carry on such a suit for the infant." The absolute power of the chancellor in determining all matters of this character is made clear in Reeve, Domestic Relations (4th Ed.) 332, 334. Indeed, the privilege of suit by next friend in behalf of a person non compos mentis seems to be of modern growth, and is wholly the creation of the chancellor. 5 Bac. Abr. p. 47. Substantially, the whole practice touching this topic is given by Lord Chancellor Brougham in Nalder v. Hawkins, 2 Mylne & K. 243, with practically the same results as stated by us. The ordinary rule is laid down in Story, Eq. Pl. (10th Ed.) § 60, as follows:

"As some check upon the general license to institute a suit in behalf of an infant, if it be represented to the court of equity that the suit preferred in his name is not for his benefit, an inquiry into the facts will be directed to be made by one of the masters of the court; and, if he reports that the suit is not for the benefit of the infant, the court will stay the proceedings."

The rule is given in Daniell, Ch. Pr. (5th Ed.) *70, to the same effect, although, in lieu of making the general proposition of a reference to a master, the author merely says, that the court will "direct an inquiry concerning the propriety of the suit." The entire freedom with which the court proceeds to ascertain for itself whether it is for the interest of the petitioner or plaintiff that the suit proceed is illustrated in Sale v. Sale, ubi supra, where Lord Langdale, whose experience and learning are sufficient authority for our purpose, listened to affidavits furnished by the defendant, and, without reference to a master, directed the suit to be dismissed, and the costs to be paid by the next friend. He closed with a general statement of the law, applicable in all courts, as follows:

"It matters little what the nature of the suit is. When a party comes here, using the privilege of acting on the behalf and as the next friend of infants, it is his bounden duty to show that he really acts for the benefit of the infants, and not to promote purposes of his own."

In Walker v. Else, 7 Sim. 234, Vice Chancellor Shadwell dismissed in even a more summary manner a suit by a next friend.

The substance of these propositions is recognized in equity rule 87, and such undoubtedly is the common law, although a due regard for a proper administration of justice will ordinarily induce the court to ascertain the facts by a reference to a master or an assessor, or by taking the proofs itself, with opportunity in either case for the next friend or the guardian ad litem, or whomsoever may assume to act for the petitioner or plaintiff, to examine the witnesses, produce proofs, and be otherwise heard. But the petitioner

relies on a provision of the Revised Statutes touching proceedings on habeas corpus, as follows:

"Sec. 761. The court, or justice, or judge shall proceed in a summary way to determine the facts of the case, by hearing the testimony and arguments, and thereupon to dispose of the party as law and justice require."

This provision of law, as it now stands, apparently governs all proceedings based on a petition conforming to section 754 of the Revised Statutes, of which the case at bar is assumed to be one. Originally, however, it related only to proceedings under Act Feb. 5, 1867, c. 28 (14 Stat. 385), and therefore was of a limited effect, and not a general rule of practice. For this reason alone, it might well be doubted whether this provision of the Revised Statutes was intended to reach a question of the class which we are now considering. It clearly relates to the facts touching the disposition of the petitioner; that is to say, to the merits of the proceeding. If construed as the petitioner claims, it would apparently compel the court in every case to proceed at once to the merits, without any opportunity for the investigation of preliminary questions, and would have a more drastic operation than it could reasonably be supposed congress intended. The sweeping construction claimed by the petitioner is not consistent with the discretion exercised in granting or refusing writs of habeas corpus in Ex parte Royall, 117 U. S. 241, 6 Sup. Ct. 734, and in the line of cases following it, which are grouped in Re Frederich, 149 U. S. 70, 75–77, 13 Sup. Ct. 793. It can hardly be supposed that congress had in mind, in this enactment, every phase of the preliminary questions which might arise in proceedings of this character, and intended either to blot them out, or to lay down rules touching them before unknown to the law. Its fair construction is that it seeks to secure an efficient administration of justice, and nothing more. We must admit that no case has been cited to us in which this summary method of proceeding by a court to stay a suit at its discretion has been applied to one touching a writ of habeas corpus; and it may be that there is some ground of distinction between ordinary proceedings and this at bar, which has not been brought to our attention. But we need not pursue these topics further, nor determine the power and duty of this court concerning them, because the case at bar does not go to the extent supposed by the petitioner. As we have already seen, the order of March 23d did not direct a discontinuance of the suit, or give the guardian ad litem an absolute election so to discontinue, or conclude the court to act on his election. Even, therefore, if the order had been irregular in any particular, the most that could be said of it is that it was an irregularity in the course of summary proceedings, not necessarily prejudicial, and the consequences of which might have been fully met and obviated later in the cause. Ordinarily, such irregularities, especially in proceedings which are heard wholly by the court, and in no part in the presence of a jury, do not, of themselves, furnish the basis of an appeal. Pennsylvania Co. v. Roy, 102 U. S. 451; Pollak v. Association, 128 U. S. 446, 9 Sup. Ct. 119; Ruckman v. Cory, 129 U. S. 387, 390, 9 Sup. Ct. 316; Railway Co. v. Volk, 151 U. S. 73, 14

Sup. Ct. 239; Hinds v. Keith, 6 C. C. A. 231, 57 Fed. 10, 13. Especially is this proposition true in the present case, where it is apparent the court proceeded tentatively, carefully feeling its way, and expressly reserved to whomsoever might be interested the opportunity of being heard, after the report of the guardian came in, on the question whether the court would then receive testimony and arguments. This proposition does not contravene the general rule that on appeal the whole record may be examined for errors. Ridings v. Johnson, 128 U. S. 212, 218, 9 Sup. Ct. 72; Trust Co. v. Seasongood, 130 U. S. 482, 9 Sup. Ct. 575.

It is our opinion that the petitioner has not brought the record into form to raise in this court the questions which are sought to be raised, touching the orders of March 23d and April 23d. As we have already shown, according to the true effect of the order of March 23d, all parties who had any standing in court, or who could be heard by it, had opportunity, on the coming in of the report of the guardian, to present any question they desired to raise, including the question whether any one was entitled to offer testimony and arguments. The record fails to show that the petitioner availed himself of this opportunity. In his argument to this court, he has stated what he alleges he could have proved if he had been permitted to do so; but, so far as the record is concerned, there is an entire failure to show that he offered any proofs, or that he had any proofs to offer which would have been effective if offered. This court, therefore, is asked to reverse the judgment of the court below, without any evidence in the record that any party was prepared to present to that court any facts which ought to have influenced its conclusions. It is true that the record shows that the judgment of the court below was based on the report of the guardian, but, in the absence of any other matter offered to it, the court had a right to discharge the writ, and was required to do it; and it is unimportant whether it did it on the consideration of the report, or without consideration of it. The order discharging the writ, in the absence of proofs, would be made of course, and it cannot affect its correctness that reasons outside of the law were given for what was necessarily done. Ridings v. Johnson, 128 U. S. 218, 9 Sup. Ct. 72; Sullivan v. Mining Co., 143 U. S. 431, 12 Sup. Ct. 555; Spalding v. Castro, 153 U. S. 38, 14 Sup. Ct. 768.

There can be no question that if this was an ordinary suit these suggestions would be conclusive against the petitioner on this appeal. This is a common-law suit, in which judgment must be entered as on a writ of error. Cuddy, Petitioner, 131 U. S. 280, 287, 9 Sup. Ct. 703. Yet, as it comes to us on appeal, all the strictness of ordinary common-law proceedings ought not to be required. Nevertheless, the proposition is fundamental, and is necessary to prevent an appellate court from exercising virtually original jurisdiction that the court below must have had an opportunity to pass on the questions raised on appeal, and that whether it had such opportunity must appear by the record or be fairly inferable from what does appear in it. In this case the requisite facts do not appear by the record, and they cannot be inferred from it, unless it can

be said that the appeal taken in open court on the same day the order of April 23d was entered—but, of course, after it was entered —raised this implication by reflected light. We are not aware of any practice or precedent which would justify this method of making good this omission, and Warfield v. Chaffe, 91 U. S. 690, and Clark v. Com., 128 U. S. 395, 9 Sup. Ct. 2, 113, seem to the contrary. Indeed, for aught that appears, the petitioner—and in this connection we mean by this word "petitioner," King, his next friend and the counsel of record—was content to rest the case on the proposition that the detention in the McLean Asylum was illegal merely because the commitment under the order of the chief justice of Rhode Island, or under the assent of the visiting committee of the asylum, did not conform to law. This proposition was urged on us in argument. It was not finally disposed of until this court passed on it, and until we determined, in the opinion filed June 4, 1894, that the committal was not in disregard of the provisions of the constitution and laws of the United States, and, in this opinion, that the formality of the papers of committal are of no consequence, so far as the circuit court was concerned. Therefore, so far from any implication appearing that the petitioner offered to the circuit court the proofs which he says he might have offered, if allowed, and that they were rejected, there is fully as much ground for inferring that he saw fit to rest his case on the question of law we have stated, or, at any rate, that that court was not advised on what ground he intended to rely. However, the record itself suggests no inference one way or the other. It does not show that the petitioner objected to the special duties imposed on the guardian ad litem, or to any part of the order of the court touching the same, or that after it came in he took any steps which required the circuit court to halt before entering the order of April 23d. The rule applicable we have stated, and it is also succinctly given by the court of appeals, in the Fourth circuit, in Manufacturing Co. v. Joyce, 4 C. C. A. 368, 54 Fed. 332, 333, as follows:

"The rule is well established that the appellate court will only permit those matters to be assigned for error that were brought to the attention of the court below during the progress of the trial, and then passed upon."

Again, it was said by the court of appeals, in the Eighth circuit, in Railway Co. v. Henson, 7 C. C. A. 349, 58 Fed. 531, that "an appellate court can consider only such matters as are properly of record," and that "a matter not appearing of record has no existence as a predicate for error." These observations were intended to apply, and do apply, alike to appeals and writs of error. We refer also to Fisher v. Perkins, 122 U. S. 522, 527, 7 Sup. Ct. 1227. We are controlled by the fact that the record fails to put the petitioner in a position to assign for error any matter based on the claim that the circuit court was asked to hear proofs and arguments which it did not hear. In no event, therefore, can the petitioner object to the final judgment of the court below, whatever reasons were assigned in it for the ordering of it.

It is a satisfaction to know that if the petitioner, or any person assuming to act in his behalf, has, according to his judgment, failed

to obtain a full determination of the issues of fact which this case suggests, on formal proofs and arguments, the final conclusion of the case operates only as a discontinuance, without passing on the merits, and is no bar to a new application to any tribunal having jurisdiction, wherever the petitioner may be.   Judgment of the circuit court affirmed, with costs of this appeal against Caleb Eaton.